**BLACK JACK DISTRIBUTORS, INC., Queen Paper Back Corp., and G & M Bookstore, Inc., Plaintiffs,**

v.

**Abraham BEAME, Individually and as Mayor of the City of New York, Sidney Baumgarten, Individually and as Assistant to the Mayor of the City of New York, Michael Codd, Individually and as Police Commissioner of the City of New York, Jeremiah T. Walsh, Individually and as Commissioner of Buildings of the City of New York, Cornelius F. Dennis, Individually and as Borough Superintendent of the Department of Buildings of the City of New York, John T. O'Hagan, Individually and as Fire Commissioner of the City of New York, Donald Gray, and W. X. Fincke, Defendants.**

No. 77 Civ. 2570 (JMC).

United States District Court,
S. D. New York.

June 22, 1977.

---

Kassner & Detsky, P. C., New York City (Herbert S. Kassner, New York City, of counsel), for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City (Jeffrey E. Schanback and Angelo Aiosa, New York City, of counsel), for defendants.

## OPINION AND ORDER

CANNELLA, District Judge.

Plaintiffs, three so-called "adult" bookstores [1] engaged in the sale of sexually explicit books, magazines and 8 millimeter films (hereinafter "sexually explicit materials") [2] to consenting adults, bring this action pursuant to 42 U.S.C. § 1983 to escape the effects of New York City's recent campaign to "clean up" the Midtown area of New York County ("the Midtown area"). The case is presently before the Court on plaintiffs' motion for a preliminary injunction. The injunction is hereby granted in accordance with the Opinion below.

## FACTS

On January 17, 1976, an agency called the Midtown Enforcement Project ("Project") was created.[3] The Project is funded by a federal grant from the Law Enforcement Assistance Administration and operates as a coordinating agency under the auspices of the Office of the Mayor of the City of New York. It has as its purpose the investigation, identification and prosecution of illicit activities endemic to the Midtown area. Certain activities of the Project, along with those of the New York City Police Department and the Manhattan District Attorney's Office, form the subject matter of this lawsuit.

On the staff of the Midtown Enforcement Project is a health inspector, a building inspector and a fire inspector. These three, together with the two Police Officers who supervise and coordinate the inspectors' work, form the Project's inspectional task force. It is alleged that Building, Fire and Health Code [4] enforcement has been focused on sexually oriented businesses through routine periodic inspections conducted by the Project. John Russell, the supervising attorney of the Project, testified that such inspections are made in Midtown Manhattan without regard to the type of business occupying the premises. Ninety percent of the Project's inspections, however, involve buildings housing sexually oriented enterprises.[5]

It is also alleged that the inspectional team of the Midtown Enforcement Project has engaged in the practice of obtaining vacate orders based upon information or allegations known to be false. A few specific instances are presented as evidence of this practice.

On July 7, 1976 the Crossroads Bookstore was closed pursuant to an ex parte order obtained by the Project. It was soon discovered that the order was based upon erroneous information provided by defendant Jeremiah Walsh, Commissioner of Buildings of the City of New York. After a check of the Building Department's files, the error was conceded and the complaint

1. Plaintiffs are Black Jack Distributors, Inc. ("Black Jack"), located at 210 West 42nd Street, New York City; Queen Paper Back Corp. ("Queen"), located at 427 West 42nd Street, New York City; and G & M Bookstore, Inc. ("G&M"), located at 136 West 42nd Street, New York City.

2. These businesses also have "peep shows" on the premises.

3. There is evidence that the project succeeded to the functions of a prior organization formed by defendant Sidney Baumgarten.

4. These codes are all part of the Administrative Code of the City of New York.

5. Russell testified that this was probably caused by the fact that follow-up inspections were made when violations were found. Therefore, premises that have a history of violations will be inspected more often than other premises. There is no evidence before the Court which corroborates this testimony or indicates that sexually oriented businesses have a history of Code violations. In fact, the only evidence involving Administrative Code violations of sexually oriented business premises presently in the record shows that these determinations were erroneous (except for one, the Show-World violation, which is being challenged as discriminatory in a separate action in this Court).

withdrawn.[6] Nonetheless, the premises remained closed for approximately one week.

On March 17, 1977, plaintiff Black Jack was served with a vacate order at its 42nd Street premises. The order was primarily based upon the store's failure to have a second means of ingress and egress.[7] Uncontested evidence showed that, since at least 1968, there had been a second means of ingress and egress and that one was there the day the vacate order was served and enforced. Indeed, when Justice Oliver Sutton of the New York Supreme Court inspected the premises a few days later he immediately allowed the store to reopen, finding no such violation. Shortly thereafter, the Fire Department dismissed the vacate order. However, the premises had been forced to remain closed for five days.

On March 25, 1977, a sexually oriented enterprise called Show-World was forced to close due to a sprinkler violation in its building. Of the twenty-one buildings with such sprinkler violations in New York County, the Show-World premises was the only one served with a vacate order. Show-World was permitted to reopen when Judge Constance Baker Motley of this Court entered an order temporarily restraining enforcement of the vacate order. Show-World's motion for a preliminary injunction is presently under advisement.

Although the Midtown Enforcement Project engages in no penal law prosecution of its own, it has liason with the Police Department through the Chief of the Public Morals Division and communicates with the Manhattan District Attorney's Office. John Russell testified that these channels serve only as conduits for the exchange of information.[8] Plaintiffs, however, maintain that the Project, the Police Department and the District Attorney's Office are presently engaged in a joint effort to "clamp down" on sexually oriented businesses in Manhattan in general and, specifically, to force plaintiffs out of business.

This latter allegation is supported by the following events. On April 22, 1977, Manhattan District Attorney Robert Morgenthau and members of his staff met in his office with representatives of the Police Department's Public Morals Division to discuss the "obscenity problem." At the meeting it was decided that enforcement efforts would be concentrated on the plaintiff bookstores believed to be owned and operated by Alfred Scotti.[9] It was also agreed, either at this meeting or just prior thereto, that "desk appearance tickets" would no longer be issued to persons arrested in "adult" bookstores on obscenity charges.[10]

The "desk appearance ticket" procedure enables a qualifying defendant (that is, one who can establish his pedigree) to leave the stationhouse after the initial processing merely by accepting a written ticket requiring his appearance in court at some future time. Without the "desk appearance ticket," the prisoner is forced to remain in custody until he can be arraigned, usually on the day following his arrest.[11]

Shortly after the April 22 meeting, almost daily arrests and seizures were effected at plaintiffs' premises; between May 2

---

6. At the hearing on plaintiffs' motion, Russell testified that the error had been caused by the building owner who had transposed the file numbers on certain documents in the file.

7. The other violations listed in the vacate order were quickly rectified.

8. One wonders how the Midtown Enforcement Project, itself not engaged in any penal law enforcement, could effectively perform its function of coordinating "the investigation, identification and prosecution of illicit activity endemic to the Midtown area," as Russell put it, if it merely receives information from the Police Department and District Attorney's Office, as Russell and Captain Robert Cantwell of the Public Morals Division testified.

9. It was thought that these were the largest operations, and the most visible.

10. "Desk appearance tickets" are still issued to other individuals arrested on obscenity charges.

11. After arraignment, plaintiffs' employees invariably were either released on their own recognizance or required to post a small bond.

and May 19 [12] there were between twenty and thirty arrests for the promotion and sale of obscene material.[13] During these arrests, patrons were removed and the premises closed, but the proprietors were not prevented from reopening the shops upon completion of the arrests and seizures. Witnesses for plaintiffs testified that the arrests were usually effected during the stores' busiest periods and that the stores were forced to remain closed for between one and two hours. The materials "deemed obscene" and seized from plaintiffs' premises are characteristic of material sold in all "adult" bookstores in the Midtown area; yet, during this time period, no other seizures or arrests under the New York obscenity laws were made in the Midtown area.

## DISCUSSION

■ Based on these events plaintiffs argue that defendants are engaged in bad faith enforcement of the obscenity laws, done solely to harass plaintiffs and drive them out of business. Such a campaign, they assert, interferes with the free exercise of First Amendment rights.[14]

■ Before reaching the merits, however, the Court must decide whether plaintiffs having standing to bring this action, whether the lawsuit presents a justiciable case or controversy, and whether the Court

has equitable jurisdiction to issue an injunction such as the one sought by plaintiffs.[15]

*Standing*

■ The First and Fourteenth Amendments do not guarantee freedom of speech to corporations. *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 514, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Gajon Bar & Grill, Inc. v. Kelly,* 508 F.2d 1317, 1322 (2d Cir. 1974). Corporations, however, do have standing to defend the First Amendment rights of their employees where the challenged activity also causes adverse economic consequences to the corporation. *Gajon Bar & Grill, Inc. v. Kelly,* 508 F.2d at 1322; *227 Book Center, Inc. v. Codd,* 381 F.Supp. 1111, 1115 n.4 (S.D.N.Y. 1974) (MacMahon, J.); *Hamar Theatres, Inc. v. Cryan,* 365 F.Supp. 1312, 1319–20 (D.N.J.1973), *vacated and remanded to consider mootness,* 419 U.S. 1085, 95 S.Ct. 670, 42 L.Ed.2d 675 (1974), *modified,* 390 F.Supp. 510 (D.C.N.J.1975). *See Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (a party facing economic injury as a result of the deprivation of constitutional rights of others has standing to raise the issue). This principle extends to suits, brought by corporations pursuant to 42 U.S.C. § 1983, to enjoin future police activity. *California Diversified Promotions, Inc. v. Musick,* 505 F.2d 278, 283 (9th Cir. 1974); *Citizens for a Better Environment,*

12. On May 24, 1977 defendants agreed to cease the arrests and seizures at the subject premises. On June 2, 1977, when defendants withdrew their consent, the Court entered a Temporary Restraining Order granting such relief. At defendant's request, the TRO was modified on June 7 and, as modified, remains in effect.

13. New York Penal Law § 235.05.

14. Plaintiffs also argue that, by singling out their employees for prosecution under the obscenity laws, defendants are engaging in the unconstitutional practice of discriminatory law enforcement. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). At this stage of the litigation, however, the Court is unwilling to conclude that initiating an enforcement campaign against the largest and most visible violator of a criminal statute constitutes an unjustified abuse of prosecutorial discretion.

15. Defendants have moved to dismiss for lack of in personam jurisdiction based upon their claim that they have not been personally served with the summons and complaint in the within action. However, in the Order to Show Cause issued in this case, the Court provided that personal service of copies of the Order and the remainder of the motion papers upon defendants *or their attorneys* would be deemed good and sufficient service. Service of the motion papers on behalf of all defendants was admitted by W. Bernard Richland, Corporation Counsel of the City of New York, on May 24, 1977. There is no claim that Richland does not in fact represent all defendants, and a representative of his office appeared before the Court when plaintiffs presented the Order to Show Cause. Accordingly, the Court finds that under the circumstances of this case it has jurisdiction over the defendants.

*Inc. v. Nassau County,* 488 F.2d 1353, 1361 (2d Cir. 1973). Because plaintiffs have shown that their business has been disrupted and is suffering due to defendants' allegedly unconstitutional actions, they have standing to pursue this lawsuit.

Moreover, plaintiffs are entitled to challenge defendants' conduct because they are among the "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." *Craig v. Boren,* 429 U.S. 190, 195, 192–97, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). *See also Carey v. Population Services Int'l,* —— U.S. ——, ——, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Thus, plaintiffs herein have standing to assert the claim that defendants' conduct, allegedly aimed at discouraging the distribution of sexually explicit publications and films, will dilute their patrons' First Amendment right to purchase such material. *Craig v. Boren,* 429 U.S. at 195, 97 S.Ct. 451; *Griswold v. Connecticut,* 381 U.S. at 481, 85 S.Ct. 1678.

*Live Case or Controversy*

■ The Court finds that there exists an "actual case or controversy" sufficient to render the instant dispute justiciable. Prior to the institution of the lawsuit, arrests and seizures were taking place on an almost daily basis. Defendants have instructed both the Court and plaintiffs that they intend to resume such activities once given

leave to do so. Thus, the threat of prosecution cannot be characterized as speculative, *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); nor plaintiffs' concern "chimerical." *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (plurality opinion). Plaintiffs have shown an imminent threat of prosecution for conduct in which they plan to engage. This is sufficient to satisfy the case or controversy requirement of Article III of the Constitution. *Carey v. Population Services Int'l,* —— U.S. ——, ——, n.3, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Steffel v. Thompson,* 415 U.S. 452, 459–60, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

*Equitable Jurisdiction*

■ Defendants argue that under the principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its companion cases [16] this Court should decline to exercise jurisdiction over the controversy.[17] In *Younger,* the Supreme Court held that federal courts may not enjoin pending state criminal prosecutions except under extraordinary circumstances—where the danger of irreparable loss is both great and immediate. The threat to plaintiff's federally protected rights must be one that cannot be eliminated by defense against a single criminal prosecution.[18]

■ However, any notion that such policies prevail where no pending state proceedings are being challenged has recently been laid to rest. In such cases the normal rules regarding preliminary and permanent injunctive relief apply, and *threatened* pros-

16. *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Boyle v. Landry,* 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); *Dyson v. Stein,* 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); *Byrne v. Karalexis,* 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

17. Although at first blush 28 U.S.C. § 2283 seems to bar the relief sought herein, the Supreme Court has concluded that the anti-injunction statute does not apply to actions brought pursuant to 42 U.S.C. § 1983, *Trainor v. Hernandez,* —— U.S. ——, ——, n.8, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Mitchum v. Foster,* 407 U.S. 225, 242–43, 92 S.Ct. 2151, 32

L.Ed.2d 705 (1972). The Civil Rights Act is one of the "expressly authorized" exceptions to § 2283. This, of course, does not exempt 1983 actions from the normal rules of federal abstention. *Mitchum v. Foster,* 407 U.S. at 243, 92 S.Ct. 2151; *Citizens for a Better Environment, Inc. v. Nassau County,* 488 F.2d 1353, 1359 (2d Cir. 1973).

18. This doctrine has been extended to civil cases. *Trainor v. Hernandez,* —— U.S. ——, ——, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Judice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

ecution may be enjoined without regard to *Younger* principles. *Wooley v. Maynard,* — U.S. —, —, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (upholding grant of permanent injunctive relief); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 930–31, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (upholding grant of preliminary injunctive relief); *see also Allee v. Medrano,* 416 U.S. 802, 813–16, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Lake Carriers Ass'n v. MacMullan,* 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). As plaintiffs herein do not seek to enjoin any pending state court prosecutions,[19] the Court will proceed to a consideration of the merits of plaintiff's claims.

*Preliminary Injunction Standard*

■ The now familiar standard for the issuance of a preliminary injunction is a showing that there exists a threat of irreparable harm plus either probable success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiff. *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 440–41 (2d Cir. 1972); *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247 (2d Cir. 1973). The Court finds that plaintiffs have satisfied the "serious questions going to the merits" alternative and are thus entitled to preliminary injunctive relief.

*The Merits*

Plaintiffs claim that for some time the Midtown Enforcement Project has been engaged in a program of enforcing the Administrative Code in a discriminatory manner that is aimed at interfering with the operations of sexually oriented businesses. They assert that the Police Department and the District Attorney's Office have now joined in this effort and are presently engaged in a program of enforcement of the obscenity laws that is calculated to drive them out of business. They maintain that the purpose of this enforcement activity is to discourage the sale of sexually explicit publications and films, materials that are protected by the First Amendment.

■ Where this type of harassment is alleged, injunctive relief against its continuation is appropriate if plaintiffs establish (1) bad faith use of the state's legal machinery for the purpose of inhibiting the exercise of First Amendment rights, and (2) a probability of irreparable injury. The latter is established upon a showing of a significant chilling effect on First Amendment rights that cannot be avoided by state court adjudication. *Cameron v. Johnson,* 390 U.S. 611, 619–20, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (semble); *Thomie v. Dennard,* 459 F.2d 1037 (5th Cir. 1972); *Lewis v. Kugler,* 446 F.2d 1343, 1350 (3d Cir. 1971); *Sheridan v. Garrison,* 415 F.2d 699, 709 (5th Cir.), *cert. denied,* 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1969).[20] Injunctive relief is available even where the statute being enforced is itself valid, as it is just as easy to discourage the exercise of First Amendment rights by abusing a valid statute as by using an invalid one. *Jones v. Wade,* 479 F.2d 1176, 1182 n.11 (5th Cir. 1973); *Krahm v. Graham,* 461 F.2d 703, 707 (9th Cir. 1972).

---

**19.** Although a number of plaintiffs' employees are subjects of outstanding obscenity charges, the validity of these arrests is conceded for the purposes of this motion. The Court does not take this to mean, however, that the bona fides of the prosecutions are conceded. It should be noted that the resolution of the state prosecutions will not resolve the issues raised by plaintiffs herein, as might be the case were plaintiffs challenging the constitutionality of the statutes involved. *See, e. g., Trainor v. Hernandez,* — U.S. —, —, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), and cases cited therein.

**20.** Even pending prosecutions may be enjoined where they are found to have been instituted purely for harassment. *Trainor v. Hernandez,* — U.S. —, —, n.7, 97 S.Ct. 1911, 52 L.Ed.2d 486 (U.S. May 31, 1977); *Kulger v. Helfant,* 421 U.S. 117, 124–25, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Mitchum v. Foster,* 407 U.S. 225, 230–31, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

■ In the leading case in the area, *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), plaintiffs sought declaratory relief in addition to an injunction restraining the defendants from prosecuting or threatening to prosecute them for alleged violations of the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. Plaintiffs claimed that the challenged statutes violated the First and Fourteenth Amendments and were being enforced, without any expectation of securing valid convictions, as part of a plan to employ arrests, seizures and threats of prosecution in order to discourage plaintiffs from engaging in civil rights activities. The Court held that, particularly where threatened prosecutions may inhibit the full exercise of First Amendment freedoms, injunctive relief is appropriate to terminate such bad faith activity on the part of law enforcement officials. 380 U.S. at 490–92, 85 S.Ct. 1116.[21] Numerous other courts have agreed that an injunction should issue where a statute is used for the purpose of discouraging protected activities. *E. g., Thomie v. Dennard,* 459 F.2d 1037 (5th Cir. 1972); *Stamler v. Willis,* 415 F.2d 1365, 1369 (7th Cir. 1969), *cert. denied,* 399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796 (1970); *Gardner v. Ceci,* 312 F.Supp. 516, 519 (E.D.Wis.1970).

■ In the area of sexually oriented literature and films, state prosecuting authorities may vigorously enforce obscenity laws when the purpose is to punish the promotion or sale of *obscene* material, or to deter such promotion or sale. However, such law enforcement will run afoul of the Constitution if its purpose is to force a sexually oriented enterprise to cease doing business or to refrain from dealing in presumably protected sexually oriented materials. In those circumstances such activity constitutes an invalid restraint on First Amendment rights.

For this reason, the court in *Krahm v. Graham,* 461 F.2d 703 (9th Cir. 1972), granted an injunction against pending and future prosecutions. Plaintiffs, "adult" bookstore owners and employees, had been the subject of more than 100 prosecutions within a two-year period. Only eleven cases had been brought to trial, and none resulted in convictions. Many of these cases involved seizures made despite a state court ruling that the methods used were illegal. These findings formed the basis for the court's conclusion that the arrests, seizures and prosecutions were part of a scheme to harass the bookstore proprietors in bad faith and to drive them out of business.

Similarly, in *Miami Health Studios, Inc. v. City of Miami Beach,* 353 F.Supp. 593 (S.D.Fla.1973), *vacated on other grounds,* 491 F.2d 98 (5th Cir. 1974), plaintiff's premises had been subjected to ten "raids" in a 4½ month period; during some of these raids the police officers announced that they would continue until the employees quit and the business closed. Some employees were detained in jail unnecessarily until processing was completed, on occasion as long as seven hours, and some employees were threatened with overnight detention. At the time suit was commenced none of the pending prosecutions had been brought to trial. The court found that these prosecutions had been undertaken in bad faith.[22]

Certain aspects of both of these cases are present here. There have been between twenty and thirty arrests, and no prosecutions have proceeded to trial. Arrests and seizures were made despite state and federal court rulings that the procedures used were invalid. Defendants herein are admittedly trying to drive plaintiffs out of business, and plaintiffs' employees have been

---

21. Because *Dombrowski* involved a statute that was itself found violative of First Amendment rights, the court in *Wallace v. Brewer,* 315 F.Supp. 431 (M.D.Ala.1970), read the Supreme Court's decision therein to mean that a plaintiff seeking to obtain relief from state prosecution must attack the state statute on its face and cannot rely on a challenge to the constitutional-

ity of allegedly discriminatory actions of state officials. 315 F.Supp. at 444. This Court finds absolutely no support for this proposition in *Dombrowski.*

22. The court also declared the statute being enforced unconstitutionally vague.

detained in jail overnight without apparent reason.

More specifically, the errors made in enforcement of the Administrative Code plus the high percentage of inspections of premises housing sexually oriented businesses raise the inference that such activities have a secondary motive.[23] This inference is supported by statements attributed to Sidney Baumgarten, Assistant to the Mayor of the City of New York and head of the Midtown Enforcement Project. At a speech delivered on November 13, 1975 at the Salvation Army Headquarters on Fifty-Second Street Baumgarten stated that "despite all constitutional limitations we stop at nothing when we put these [sexually oriented enterprises] out of business. We undertake activities knowing that they are illegal." He has reputedly also stated that the Police Department would be used to accomplish these goals. Moreover, Baumgarten has instructed Cornelius Dennis, Borough Superintendent of the Department of Buildings, not to approve or issue permits for sexually oriented businesses until he has reviewed the Building Department file. This has apparently resulted in no such permits being issued.[24]

With respect to the multiple arrests mentioned above, there is strong evidence indicating that they were effected in a manner calculated to maximize the negative impact on plaintiffs' business. The arrests conformed to the following pattern. A Police Officer purchased a book or film in one of the three bookstores. This article was then taken to a judge, who examined it and, if appropriate, executed a warrant for the seizure of other copies of the article and for the arrest of the individual who sold it. Police officers then returned to the store, closed it temporarily (during peak business hours), effected the arrest of the person described in the warrant and searched for other copies of the article named in the warrant. If other copies were found, they were seized (up to six copies) and the other employees in the store arrested.

On the four occasions that the article named in the warrant was not found, however, the officers searched for articles that they knew had been named in other warrants (but had not been finally determined to be obscene) and, upon finding such articles, arrested the remaining employees in the store. This procedure was long ago held invalid under New York law. *227 Book Center, Inc. v. Codd*, 381 F.Supp. 1111, 1114 (S.D.N.Y.1974) (MacMahon, J.); *People v. Gomez*, 73 Misc.2d 623, 342 N.Y.S.2d 903 (Crim.Ct. New York County 1973). This use of an invalid arrest procedure indicates a desire to empty the store of personnel, thereby forcing it to remain closed until replacements arrived. Although these isolated illegal arrests would not themselves be sufficient cause for the exercise of a federal court's equitable powers, *Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), they are only part of what appears to be a persistent pattern of police misconduct, for which injunctive relief is appropriate. *Allee v. Medrano*, 416 U.S. at 815, 94 S.Ct. 2191; *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Lewis v. Kulger*, 446 F.2d 1343, 1350 (3d Cir. 1971).

Another part of the pattern is the withdrawal of the desk appearance privilege from employees of "adult" bookstores arrested on obscenity charges. An admitted purpose of this change is to discourage these individuals from working in such stores. No other reason for the change in policy was proposed by defendants, and such change does not appear related to ensuring later court appearances.

In fact, the Police Department and the District Attorney's Office have made no secret of the purpose of the entire operation. In a memo summarizing the plans

---

**23.** Although these administrative proceedings are not subject to challenge herein, they may be considered as evidence of a pattern and practice of unlawful conduct. *Lewis v. Kulger*, 446 F.2d 1343, 1348–49 (3d Cir. 1971).

**24.** This evidence, along with most of what appears in the record, has not been controverted by defendants.

made at the April 22 meeting it was stated the enforcement would be concentrated on the plaintiffs "in order to have the greatest impact and perhaps cause a loss of profit, thereby making it prohibitive to remain open." At the hearing on plaintiffs' motion, Captain Robert Cantwell of the Public Morals Division of the Police Department testified that one of the objects of the concentrated arrests and the discontinuance of the desk appearance policy was to discourage plaintiffs' employees from continuing to work in plaintiffs' stores and, ultimately, to close the stores or force them to abandon the sale of sexually oriented materials. Regardless of the propriety of focusing enforcement of the obscenity laws on plaintiffs' stores, this cannot be carried out in a manner calculated to discourage them from selling material protected by the First Amendment.

It also should be noted that, although the District Attorney's Office vowed to vigorously prosecute the obscenity cases, none of the prosecutions arising from arrests of plaintiffs' employees has proceeded beyond the arrest stage, and none of the seized materials has been finally determined to be obscene.[25]

On the present record, the Court might not be able to conclude with the certainty required after a full trial on the merits that the defendants are engaging in a persistent pattern of misconduct aimed at deterring the sale of sexually oriented materials in the Midtown area and, particularly, in plaintiffs' stores. However, plaintiffs have raised sufficiently serious questions as to the existence of such conduct to warrant the issuance of a preliminary injunction.

The Court emphasizes that it is not the number of prosecutions alone that leads it to reach this conclusion, for multiplicity of prosecutions does not show bad faith or harassment on the part of law enforcement officials. *Grandco Corp. v. Rochford,* 536 F.2d 197 (7th Cir. 1976); *Sandquist v. Pitchess,* 332 F.Supp. 171, 179 (C.D.Cal.1971)

(three-judge court). The Court has considered the arrests in conjunction with the surrounding circumstances detailed above in reaching its decision.

The instant case is thus distinguishable from *Gajon Bar & Grill, Inc. v. Kelly,* 508 F.2d 1317 (2d Cir. 1974), in which plaintiffs contended that repeated arrests under an ordinance, of questionable constitutionality, prohibiting topless dancing, coupled with the Town Supervisor's statement of his desire to eliminate topless dancing, evidenced harassment and bad faith prosecution. The court rejected this line of reasoning, as defendants were merely attempting to eliminate exactly that which was prohibited by the ordinance. The questionable validity of the ordinance was not itself sufficient to warrant federal court intervention. 508 F.2d at 1321. In the instant case, it appears that defendants' activity has gone beyond a mere attempt to restrict the sale of obscene material, and instead represents an attempt to eliminate the sale of all sexually oriented material by the plaintiff businesses.

*Irreparable Injury*

Assuming that defendants' efforts are aimed at discouraging plaintiffs' sale of sexually oriented material in a manner going beyond good faith enforcement of the obscenity laws, then without the protection of an injunction plaintiffs will suffer the type of irreparable injury envisioned in *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The Supreme Court therein observed that "[t]he chilling effect upon the exercise of First Amendment rights [derives] from the fact of the prosecution, unaffected by the prospects of success or failure." 380 U.S. at 487, 85 S.Ct. at 1121.

Plaintiffs and their employees are between the proverbial Scylla of abandoning the sale of sexually oriented material, much of which is protected by the First Amendment, and the Charybdis of continuing such

---

**25.** Although the instant arrests are of relatively recent vintage, one of Black Jack's employees has been arrested approximately seventy-five times on obscenity charges over the past nineteen years, with no convictions.

activity and suffering injury both economic (the constant disruption of business) and personal (interference with the freedom to exercise First Amendment rights without genuine fear of prosecution). *See Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir. 1974). This chilling of First Amendment rights is an impermissible burden on constitutionally protected conduct. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Allee v. Medrano*, 416 U.S. 802, 814–15, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1159–60 (2d Cir. 1974).[26]

The difficulty of plaintiffs' choice is exacerbated by the absence of any final judicial determinations of obscenity regarding materials seized at their premises. If such determinations were made, plaintiffs would at least have an idea of the local community standard of obscenity by which to guide their future conduct.[27]

*Balance of Hardships*

That the balance of hardships in this case tips decidedly in favor of plaintiffs is readily apparent to the Court. Aside from the loss of business and possible bankruptcy plaintiffs face, the public's First Amendment freedoms are threatened. On the other hand, if plaintiffs are granted the relief

they seek, defendants will merely have to alter their enforcement of the obscenity laws so as to limit the consequent incursion on First Amendment rights.

## CONCLUSION

■ In sum, the Court finds that defendants' own statements, the uncontradicted evidence as to the pattern and timing of the arrests, the illegal practice of making arrests and seizures without warrants when legal arrests cannot be made, and the apparently arbitrary withdrawal of the desk appearance privilege raise sufficiently serious questions regarding the bona fides of defendants' challenged activities to make this a fair ground for litigation. Moreover, there exists a probability of irreparable injury, both to plaintiffs' business and in the restriction of First Amendment rights, and the balance of hardships tips decidedly toward the plaintiffs.

Accordingly, the Court, cognizant of the heavy burden on a litigant seeking to enjoin the activities of state law enforcement personnel in the performance of their duties, *Munion v. Gilliam*, 543 F.2d 48, 52 (8th Cir. 1976), finds that plaintiffs are entitled to preliminary injunctive relief from continued harassment through use of the obscenity laws.

As Mr. Justice Brandeis observed in his dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928):

---

**26.** Although the Second Circuit held in *Gajon Bar & Grill, Inc. v. Kelly*, 508 F.2d 1317 (2d Cir. 1974), that it is improper for a federal court to enjoin threatened prosecutions on behalf of a corporate entity asserting the constitutional rights of others, as this would not be "absolutely necessary for the protection of constitutional rights belonging to [those] others", 508 F.2d at 1322, the Supreme Court's decision in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), upholding the grant of a preliminary injunction against enforcement of an ordinance almost identical to that challenged in *Gajon*, indicates otherwise. In *Doran* the Court held that, where First Amendment rights are at stake, an undenied claim of substantial loss of business and perhaps bankruptcy is sufficient irreparable injury to warrant issuance of a preliminary injunction. 422 U.S.

at 932, 95 S.Ct. 2561. This is the situation presently confronting the Court.

**27.** In the First Amendment area, the Second Circuit has recognized that even the delay of state court proceedings "might itself cause an impermissible chilling of the very constitutional rights which the plaintiff seeks to protect." *Thoms v. Heffernan*, 473 F.2d 478, 485 (2d Cir. 1973), *vacated for reconsideration in light of Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) and *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Long Island Vietnam Moratorium Committee v. Cahn*, 437 F.2d 344, 347 (2d Cir.), *aff'd*, 418 U.S. 906, 94 S.Ct. 3197, 41 L.Ed.2d 1153 (1970).

In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

277 U.S. at 485, 48 S.Ct. at 575 (cited with approval in *Elkins v. United States*, 364 U.S. 206, 222–23, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).

Defendant Michael Codd, as Police Commissioner of the City of New York, is hereby enjoined from causing any further harassment of plaintiffs through enforcement of the obscenity laws undertaken in bad faith and for the purpose of injuring plaintiffs' business, or to cause them to close.

Plaintiffs are directed to submit an order on notice within five days. The order shall provide that, while the Police Department of the City of New York is not prohibited from making obscenity arrests and seizures at plaintiffs' premises, *see Krahm v. Graham,* 461 F.2d 703, 709 (9th Cir. 1972), it shall do so in a manner that is not calculated to seriously injure plaintiffs' business; upon arrest, plaintiffs' employees shall be treated no differently than others arrested for similar crimes, especially with respect to the "desk appearance ticket" policy.[28]

The Court shall retain jurisdiction to amend its order on a showing of a change of circumstances.

---

28. The relief granted herein is directed solely against the Police Department through Commissioner Codd. As Police Commissioner, he is responsible for the pattern of arrests challenged herein and is appropriately the subject of injunctive relief. *Slate v. McFetridge,* 484 F.2d 1169 (7th Cir. 1973); *Build of Buffalo, Inc. v. Sedita,* 441 F.2d 284 (2d Cir. 1971); *Schnell*

The foregoing constitute the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

---

*v. Chicago,* 407 F.2d 1084, 1086 (7th Cir. 1969); *Farber v. Rochford,* 407 F.Supp. 529, 535–36 (N.D.Ill.1975). Moreover, there is presently no evidence before the Court to indicate that any of the other defendants are engaging in conduct sufficiently threatening to plaintiff to warrant the issuance of an injunction.