**TEMPLE OF THE LOST SHEEP, INC. a/k/a Action Committee to Help the Homeless Now; Henry Jerome Mackey, a/k/a Jerome Mackey, Plaintiffs,**

v.

**Robert ABRAMS, Attorney General of the State of New York; New York News, Inc.; Jack Newfield; John Davis; Thomas Whelan, and Jill Laurie Goodman, Defendants.**

**No. CV 88–3675(RR).**

United States District Court, E.D. New York.

June 7, 1989.

James Roberson, Jr., New York City, for plaintiffs.

Jerome Mackey, Flushing, N.Y., plaintiff pro se.

Robert Abrams, Atty. Gen., State of N.Y. by William K. Sanders, Asst. Atty. Gen., New York City, for defendant Goodman and pro se.

Coudert Brothers by Kevin W. Goering, New York City, for defendants Daily News and Jack Newfield.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

The Temple of the Lost Sheep, Inc. (hereinafter "Temple"), a/k/a the Action Committee to Help the Homeless Now, and one of its founders, Henry Jerome Mackey, sue Robert Abrams, the Attorney General of the State of New York; Assistant Attorney General Jill Laurie Goodman; the New York News, Inc. (hereinafter "*Daily News*"); *Daily News* reporter Jack Newfield; and former Temple members John Davis and Thomas Whelan, for conspiring to deprive them and the Temple's members of rights secured by the first and fourteenth amendments to the Constitution, and for actually violating the right freely to exercise one's religion, the rights of privacy and association, and the right to equal protection of the law. Plaintiffs further allege that defendants have violated the establishment clause of the first

amendment. They seek both legal and equitable relief.

Defendants Abrams, Goodman, Newfield and the *Daily News* move to dismiss so much of plaintiffs' claim as is barred by the statute of limitations and for abstention as to the remaining claims pending resolution of state proceedings. Defendants Newfield and the *Daily News* further move to dismiss the complaint for failure to state a claim. For the reasons here stated, the court grants the motion to abstain and stays this action until the conclusion of the related state proceedings.

## FACTUAL BACKGROUND

### 1. *Plaintiffs' Complaint*

Although defendants vigorously dispute the factual allegations of plaintiffs' complaint, for purposes of this motion, the court accepts these statements as true.

### a. Attorney General Targets Mackey

Henry Jerome Mackey claims that since 1969 he has been on a "hit list" of targets maintained by the Attorney General of the State of New York.[1] Initial investigations concerned Mackey's operation of self-defense schools. The Attorney General sought "to impose his consumer philosophy" upon Mackey and, at one point indicated he would put Mackey "out of business." Thereafter two settlement agreements were entered into, which Mackey claims were favorable to him.[2]

Beginning in 1977, the Attorney General is alleged to have conceived a conspiracy to deprive plaintiffs of constitutional rights.[3] As part of this plan, the Attorney General, in June 1977, named Mackey and others as defendants in an action pursuant to N.Y. Executive Law § 63(12) (McKinney 1982 & Supp.1988).[4] Specifically, the Attorney General sought to have Mackey make restitution to those individuals who had purchased stereo tape distributorships from Mackey Distributors, Inc. In 1975, Mackey had been convicted on six of twenty-one counts of mail fraud in a federal action that concerned his operation of Mackey Distributors. *See United States v. Mackey*, 405 F.Supp. 854 (E.D.N.Y.1975) (JBW). The New York Supreme Court found Mackey civilly liable to the distributors. Although Mackey claims that the judge who entered the order "joined the conspiracy" by holding him responsible without any civil trial, he does not indicate in his complaint what, if any, appeal he took from the order.

Unable to pay the judgment, Mackey filed a petition in bankruptcy. Nevertheless, in 1980, the Attorney General successfully moved to have Mackey held in contempt for non-payment, an order affirmed by the Appellate Division, First Department. On January 13, 1981, Bankruptcy Judge C. Albert Parente discharged Mackey's debt against the Attorney General and numerous other creditors. Although the Attorney General pursued Mackey's contempt in state court proceedings through the summer of 1981, in the end, he withdrew the matter.

### b. The Temple of the Lost Sheep

From 1960 to 1980, the Temple of the Lost Sheep operated as an unincorporated religious society. In 1979, Mackey participated in its incorporation pursuant to New

---

**1.** Named defendant Robert Abrams became New York Attorney General in 1979. His predecessor, serving at the time Mackey alleges he was targeted, was Louis J. Lefkowitz.

**2.** "Jerome Mackey's Judo Inc." also figured in a federal prosecution in which one of its employees, James E. Corr III, was convicted, along with several others, on various counts of securities fraud, mail fraud, perjury, and filing a false bank loan application, in connection with financing for the business. *United States v. Corr*, 543 F.2d 1042 (2d Cir.1976). Mackey was not a defendant in this action.

**3.** Plaintiffs do not indicate in their complaint with whom the Attorney General was purportedly conspiring at this time. Clearly, however, the other named defendants in this action are not alleged to have joined the conspiracy until October of 1988.

**4.** N.Y. Executive Law § 63(12) authorizes the Attorney General to apply to the New York Supreme Court for an order enjoining the continuance of any business activity engaged in repeated fraudulent or illegal acts, and to seek restitution and damages for any victims of the fraud.

York Religious Corporation Law §§ 191, 193 (McKinney 1952). Among the "structural objectives" of the corporation were "[t]o establish a worldwide religious movement and maintain Temples for religious worship and prayer, all in accordance with the teachings of the founder and Spiritual leader of the TEMPLE OF THE LOST SHEEP INC., the Reverend Mother, EDITH NELSON MACKEY (1905–1976)," plaintiff Mackey's mother. Among its "spiritual objectives" were the "rehabilitation of persons believing themselves to be 'Lost Souls'" and the provision of "shelter, comfort and rest, sufficient to quiet the cry of the senses, in which each member of the Congregation may enter his own (mental) closet of prayer, from which Spiritual regeneration occurs." Among its temporal objectives were the establishment of "perpetual forms of income through ownership of real property or businesses, or otherwise, and the raising of funds in every possible legal manner, with which the duly elected Trustees of this Corporation shall utilize in the fulfillment of the STRUCTURAL and SPIRITUAL objectives of this corporation...."

The Temple maintains a 19–room shelter for homeless men at 131–57 Fowler Avenue, Queens, New York. Admission is denied anyone engaged in criminal activities, addicted to drugs or alcohol, mentally deranged or otherwise inclined to violence. Those residing at the shelter must comply with the Temple's goals and rules.

#### c. The "Daily News" Involvement

Sometime in 1988, defendants Davis and Whelan were admitted to the shelter. Mackey alleges that soon thereafter he discovered that the two men were involved in "drinking, stealing and drugs." In retaliation for being told that failure to conform their behavior to the Temple's rules of conduct would result in their ouster, Davis and Whelan are alleged to have told "lies" and "half-truths" about the Temple and Mackey to Jack Newfield, a reporter for the *Daily News.*

Newfield and the *Daily News* set up a meeting for Davis and Whelan to repeat their claims to the Attorney General. In this way, Davis, Whelan, Newfield and the *Daily News* purportedly joined the Attorney General's ongoing conspiracy against Mackey. The specific plan agreed to by the defendants was "to create a public outcry against the TEMPLE, and MACKEY, and to hurt the TEMPLE financially." Toward this end, it was agreed that the Attorney General would start an investigation of the Temple and Mackey, and that the *Daily News* would publish a series of articles by Newfield critical of the Temple. In this way, the defendants hoped to encourage "credible complainants" to come forward to support a demand for the Temple's books and records. The Attorney General agreed falsely to characterize the Temple's activities as "charitable" rather than "religious" in order to justify jurisdiction for this demand. After acquiring control of the books and records, the Attorney General would "fabricate and create a cause of action against MACKEY" in order to have a state administrator appointed for the shelter.

#### d. The Issuance of Subpoenas

On October 20, 1988 and November 2, 1988, Assistant Attorney General Jill Laurie Goodman, prepared "John Doe" subpoenas to be served on Temple members found soliciting funds on the streets of New York requiring their attendance at an administrative investigation being conducted by the Attorney General's Charities Bureau. The stated purpose of the investigation was to determine whether proceedings should be instituted against the Temple pursuant to Articles 5, 6 and 7A of New York's Executive Law, Article 11 of its Business Corporations Law, Article 22–A of its General Business Law, Article 8 of its Estates, Powers and Trusts Law and Articles 1 and 7 of its Not–For–Profit Corporations Law. On October 21, 1988, Goodman issued a subpoena to Jerome Mackey returnable November 2, 1988 requiring production of the books, records, and numerous other documents relating to the operation of the Temple. Apparently, there has been no compliance with the subpoenas to date.

### e. The "Daily News" Reports

On October 24, 1988, Jack Newfield, in his column for the *Daily News*, reported on Mackey, his criminal past, the Temple, and its members' ubiquitous presence on busy New York street corners soliciting money in upside-down water coolers on behalf of the homeless. Entitling his report, "When charity gets turned upside-down," Newfield drew an analogy to Dickens' *Oliver Twist*, explaining that whereas "Fagin turned street urchins into thieves," at the Temple, "the indigent [are] coerced into begging."

He reported specifically on conversations he had had with Whelan and Davis about their experiences with the Temple. Whelan was quoted as saying that Temple shelter residents were required "to go out and beg if we want to stay there." Seventy-five percent of all money collected had to be turned over to Mackey. In December 1987, Whelan saw Temple records indicating that shelter residents had turned over $164,000 in collections to Mackey. Davis told Newfield that he had been frustrated in efforts to find a job while living at the Temple shelter because he was required to spend time raising money. He recalled Mackey saying, "Jobs are in the future. You must do fund-raising now."

Newfield reported that, in a telephone interview, Mackey admitted that "residents must produce some kind of income for the shelter. That is a condition of their staying here." When asked about the money, Mackey said that, "Every dollar that is collected here is used for services for the homeless. My income is less than $5,000 a year." When Newfield inquired about an 18–foot boat, a truck and a van that Whelan claimed had been purchased with monies collected on the street, Mackey acknowledged that the shelter owned such items.

Noting that Mackey had served six months of a five-year sentence imposed in connection with "a $300,000 swindle of investors in Mackey's stereo-tape distributorships," Newfield reported that the Temple's by-laws made it impossible to remove him as a trustee. Moreover, the by-laws prohibited Temple members from "meet[ing] with any member of the press ... for the purpose of debating, explaining or discussing the teachings or actions of the temple."

Newfield concluded by recognizing that "the combination of bad luck, old age, drugs and the housing shortage can make almost anyone homeless." Nevertheless, he urged readers to "beware of Jerome Mackey's upside-down water coolers." He urged them instead to "embrace the altruistic, authentic advocates for the homeless," giving as an example David Kirk, a Catholic priest running Emmaus House in East Harlem.

On October 25, 1988, Newfield reported in the *Daily News* on the issuance of subpoenas by the Attorney General for Temple financial records.

### 2. *Institution of Federal Action*

On November 22, 1988, plaintiffs commenced this action, moving for a preliminary injunction enjoining the Attorney General from pursuing further investigations against them without showing a compelling state interest and enjoining the *Daily News* from printing any further unbalanced critical stories on the Temple.

After reviewing papers submitted by both sides and hearing argument, the court orally denied the motion on December 6, 1988, finding it likely that the federal court would abstain from addressing the merits of the Attorney General's conduct given proceedings commenced that day in state court to enforce the outstanding subpoenas. The court further found that plaintiff had not established likely success on the merits of its claim against the *Daily News*, which, of course, had a first amendment right to report on subjects of interest to its readers.

### 3. *Pending State Proceedings*

On December 6, 1988, the Attorney General moved in New York Supreme Court for an order requiring plaintiffs to comply with outstanding subpoenas. In their amended complaint in this court, plaintiffs allege that this action was itself part of the

conspiracy, since Assistant Attorney General Goodman did not advise the Supreme Court of the pending federal suit.

On December 19, 1988, the Temple and Mackey cross moved to dismiss the Attorney General's action and quash the outstanding subpoenas. Among arguments raised in support were: (1) that the subpoenas were beyond the jurisdictional authority of the Attorney General as granted by New York law; (2) that because a church is involved, subpoenas can only issue on the showing of a compelling state interest; (3) that the first and fourth amendments to the Constitution precluded holding a church in contempt for failing to disclose its financial records; (4) that the Attorney General was engaged in a conspiracy to deprive Mackey and the Temple of constitutional rights;[5] and (5) that compliance with the subpoenas would infringe rights of privacy, association and religious belief.

Oral argument has been held on the motions and the matter is awaiting decision by the state court.

## DISCUSSION

Defendants urge this court to abstain from addressing plaintiffs' constitutional challenges to their conduct until such time as the state court rules on the validity of the outstanding subpoenas. The court agrees that abstention is appropriate in this case.

■ As a general rule, federal courts are under a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Deakins v. Monaghan*, 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). Abstention from the exercise of such jurisdiction, whether in the form of a stay of all federal court proceedings until a state court decides related questions of state law, or a dismissal of the complaint and a referral of the entire case to the state courts, is "the exception, not the

rule," justified only in limited circumstances. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. at 813, 96 S.Ct. at 1244; *accord West v. Village of Morrisville*, 728 F.2d 130, 135 (2d Cir.1984).

■ One such circumstance exists when there is a pending state proceeding in which the constitutional claims can be raised. *E.g., Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Regardless of whether the pending proceeding is criminal or civil, it is now well-established that concerns of comity and federalism warrant *Younger* abstention whenever: "(1) ... there is an ongoing state proceeding; (2) ... an important state interest is involved; and (3) ... the federal plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the [state] proceedings." *Christ the King Regional High School v. Culvert*, 815 F.2d 219, 224 (2d Cir.), *cert. denied*, 108 S.Ct. 102 (1987). *See Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. 619, 627, 106 S.Ct. 2718, 2722–23, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *University Club v. City of New York*, 842 F.2d 37 (2d Cir.1988).

■ All three conditions are met in this case. There is a related ongoing proceeding before the courts of New York, namely, the Attorney General's motion to compel compliance with outstanding subpoenas. Although plaintiffs commenced this federal action some two weeks before the state filed its motion to compel, no "proceedings of substance on the merits" had yet taken place in this court. *See Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 238,

---

5. Mackey and the Temple advised the state court that this was one of several civil rights claims presently pending in federal court. They noted that "[f]or some odd reason petitioners are of the opinion that the Federal Court will abstain from hearing the case before it."

104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984) (quoting *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2291–92, 45 L.Ed.2d 223 (1975)). Indeed, this court did not even hear argument on the motion for injunctive relief until the very day the state proceedings were brought. While a federal *grant* of injunctive relief may obviate *Younger's* concerns for "economy, equity and federalism," *Hawaii Housing Authority v. Midkiff, supra,* in this case the court *denied* plaintiffs' request for an injunction specifically noting the real possibility of abstention.

The ongoing state proceeding concerns an important state interest: the investigation and exposure of possible fraud under the guise of charitable activity. *See Huffman v. Pursue,* 420 U.S. at 604–05, 95 S.Ct. at 1208–09 (abstention clearly appropriate where ongoing civil proceeding closely related to criminal laws). Although plaintiffs vigorously dispute any fraudulent conduct and, moreover, argue that the Attorney General's investigative power does not reach religious as opposed to strictly charitable corporations, this is a question of state law, *see Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. at 628, 106 S.Ct. at 2723 (religious schools cannot claim to be totally free from all state regulations), more appropriately resolved by New York courts considering the pending motion to compel.

Plaintiffs do not dispute that they can raise their constitutional challenges to the Attorney General's investigation in the pending state proceeding. Indeed, in moving to have the state court quash the outstanding subpoenas, plaintiffs argued that compliance would infringe constitutional rights of privacy, association and religious belief. They have, moreover, advised the state court that they believe themselves to be the victims of a conspiracy aimed at abridging these constitutional rights. The state court is clearly competent to address these constitutional challenges to the subpoenas, for it has long been recognized that "[u]pon the state courts, equally with the courts of the Union, rests the obligation to guard, enforce and protect every right granted or secured by the Constitution of the United States ... whenever those rights are involved in any suit or proceeding before them." *Robb v. Connolly,* 111 U.S. 624, 637, 4 S.Ct. 544, 551, 28 L.Ed. 542 (1884).

Plaintiffs nevertheless oppose abstention on the grounds that the Attorney General is acting in bad faith. Certainly, where law enforcement actions are "not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution ... to harass ... and discourage [individuals] from asserting and attempting to vindicate ... constitutional rights," abstention is not required before a federal court intervenes. *See Dombrowski v. Pfister,* 380 U.S. 479, 482, 85 S.Ct. 1116, 1118–19, 14 L.Ed.2d 22 (1965); *Krahm v. Graham,* 461 F.2d 703 (9th Cir.1972).

In *Dombrowski* and *Krahm,* however, plaintiffs were threatened with further searches or prosecutions even after state courts had found such conduct illegal. *See also Black Jack Distributors, Inc. v. Beame,* 433 F.Supp. 1297, 1306 (S.D.N.Y. 1977) (defendants enjoined from further harassment of adult bookstore owners where evidence showed repeated violations of law and where city official in charge of enforcement project quoted that " 'despite all constitutional limitations we stop at nothing when we put these [sexually oriented enterprises] out of business.' ") (brackets in original). In this case, there has been no court finding to date of any improper conduct by the Attorney General or his staff in its investigations of Mackey-related enterprises. Neither does the record reflect continued threats of prosecution despite a history of unsuccessful attempts. *Cf. Grandco Corp. v. Rochford,* 536 F.2d 197, 204 (7th Cir.1976) (distinguishing *Dombrowski* and *Krahm* as cases in which bad faith was inferred "from evidence of multiple *unsuccessful* prosecutions.") (emphasis in original). To the contrary, the record of federal convictions supports the inference that fraudulent activity plagued both of Mackey's prior ventures, *i.e.,* his self-defense schools and his tape

distributorships. Mindful that a party invoking the bad faith exception to abstention must come forward with specific allegations supporting the claim, *see Collins v. County of Kendall, Ill.,* 807 F.2d 95, 98 (7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987), this court finds no basis for concluding that the Attorney General is pursuing his investigation of Mackey's latest venture without any expectation of achieving a legitimate law enforcement goal.

To the extent that plaintiffs urge a finding of bad faith from alleged collusion between the Attorney General and the *Daily News,* the court finds conclusory allegations in this regard insufficient to support such an inference. No facts have been alleged indicating that the *Daily News* reports on the Temple were published at the behest of the Attorney General, rather than on the independent editorial judgment of the newspaper. The mere fact that the *Daily News* arranged for former Temple members to meet with officials at the Attorney General's office and recount possible financial improprieties on the part of plaintiffs does not demonstrate bad faith. *See generally San Filippo v. U.S. Trust Co. of New York, Inc.,* 737 F.2d 246, 256 (2d Cir.1984) (meeting between civilian witnesses, police and assistant district attorney prior to grand jury appearance is customary procedure and insufficient, by itself, to support inference of conspiracy to present false testimony), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). To the contrary, law enforcement officials are expected to be receptive to public complaints and to investigate them as seems warranted in light of experience and resources.

There being no evidence of bad faith sufficient to excuse abstention and this court being convinced that plaintiffs can adequately raise their constitutional challenges to the Attorney General's conduct in pending state proceedings, this court abstains from now addressing those claims. Because there is some question as to whether plaintiffs can obtain full legal as well as equitable relief if they are successful in the pending state proceedings, the

court stays, rather than dismisses, this action against the Attorney General and his assistant until this is clarified.

Although the *Daily News* and Messrs. Newfield, Davis and Whelan are not parties in the pending state proceeding, this court nevertheless thinks that abstention is appropriate even as to them in order to avoid duplicative or piecemeal litigation. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47.

Plaintiffs' constitutional claims are, after all, premised on allegedly collusive conduct engaged in by the private defendants with the Attorney General. This is the very conduct at issue in the state action to compel compliance with outstanding subpoenas. *Younger* requires this court to abstain from reviewing constitutional challenges to this conduct insofar as the Attorney General is concerned. It makes little sense to address the same allegedly conspiratorial action as to the private defendants before the matter is resolved in state court. How the state court rules with respect to the question of whether the Attorney General was involved in any conspiracy with the other named defendants—and if he was, whether their mutual objectives were unconstitutional—could, after all, have collateral estoppel effect in proceedings in this court, at least as against plaintiffs. Thus, even as to the private defendants, this court will stay this action and abstain from hearing plaintiffs' federal claims until the conspiracy issue is resolved in state court as to the Attorney General. *See generally Lumen Construction, Inc. v. Brant Construction Co., Inc.,* 780 F.2d 691 (7th Cir.1985) (recognizing propriety, in some cases, of abstaining even as to parties not named in pending state proceedings).

The court will not address defendants' remaining challenges to plaintiffs' claims until the state proceeding concludes, since the decision in that case may very well modify, if not dispose of, certain of the claims raised here.

## CONCLUSION

Resolution of plaintiffs' federal claims are stayed pending the outcome of related

pending state proceedings. The Attorney General is directed to advise the court in writing at regular sixty day intervals as to the status of the state proceedings, the first report to be made no later than sixty days after the issuance of this memorandum and order.

SO ORDERED.