**COLONIAL FIRST PROPERTIES, LLC, Jessica Grace Anderson and Sharon Marker, Plaintiffs,**

v.

**HENRICO COUNTY VIRGINIA, a Virginia Municipal Corporation, Defendant.**

**No. Civ.A. 3:01CV462.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 19, 2001.

O. Jackson Cook, Steven M. Youngelson, Cary S. Wiggins, Cook, Youngelson & Wiggins, Atlanta, GA, C. David Whaley, Morchower, Luxton & Whaley, Richmond, VA, for plaintiffs.

Joseph T. Tokarz, II, Joseph P. Rapisarda, Jr., Ellen R. Fulmer, Karen M. Adams, Henrico County Attorney's Office, Richmond, VA, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Plaintiff Colonial First Properties, LLC, doing business as Gold City ("Gold City"),

is an existing Virginia Limited Liability Company in good standing, which owns and operates a restaurant and bar featuring live entertainment. Gold City is owned by Donna White (a Virginia resident owning 45 percent of the company), Diana White (a Virginia resident owning 5 percent of the company), and Richard Ritter (a Colorado resident owning 50 percent of the company). Plaintiffs, Jessica Grace Anderson and Sharon Marker, both residents of Virginia, have offered nude or semi-nude dance performances at Gold City and desire to offer such services in the future without fear of prosecution under the Henrico County public nudity ordinance. Defendant Henrico County, Virginia ("Defendant") is a political subdivision of the Commonwealth of Virginia and is operated pursuant to its Charter and the Constitution and laws of the Commonwealth.

Plaintiffs instituted this action seeking: (1) a judgment declaring that the public nudity ordinance of Henrico County is invalid under the Constitutions of Virginia and the United States; (2) temporary, preliminary and permanent injunctive relief for the deprivation of rights resulting from the enforcement of the ordinance against them; and (3) damages. The motion for a temporary restraining order was denied, and the Plaintiffs have abandoned their claim for damages. The action was heard on its merits on September 6, 2001, following expedited and extensive discovery. Relying on the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), Henrico County has moved this Court to abstain from deciding the merits of this action, and to stay these proceedings until the Virginia state court has the opportunity to consider, in pending criminal proceedings, the constitutional issues presented here by these Plaintiffs who are not named parties to the state criminal proceedings.

## STATEMENT OF FACTS

A brief recitation of the factual background will help frame the issues presented by the Complaint and by the County's motion. The facts upon which Gold City contends that abstention is foreclosed will be discussed along with the legal theories to which they relate.

This action was instituted after a series of interactions between Gold City and Henrico County beginning with obtaining a business license for Gold City and culminating in the citation, and in some cases, arrest, twelve of Gold City's entertainers for the violation of Henrico County Code § 13–107 (the "Ordinance") for dancing while clad only in "pasties and G-strings", and of Donna and Diana White for employing the entertainers and encouraging them to dance in that state. None of the named Plaintiffs have been prosecuted for violating the Ordinance which states:

(a) As used in this section, the term "state of nudity" means a state of undress so as to expose the human male or female genitals, pubic area or buttocks or to cover any of them with less than a fully opaque covering, or the showing of the female breast or any portion thereof below the top of the nipple, or covering of the breast or any portion thereof below the top of the nipple with less than a fully opaque covering.

(b) Every person who knowingly, voluntarily and intentionally appears in public or in a public place or in a place open to the public or open to public view in a state of nudity, or employs, encourages or procures another person so to appear, shall be guilty of a misdemeanor punishable by confinement in jail for not more than six months or a fine of not more than $500.00, or both.

(c) Nothing contained in this section shall be construed to apply to the exhibition, presentation, showing or perfor-

mance of any play, ballet, drama, tableau, production or motion picture in any theater, concert hall, museum of fine arts, school, institution of higher learning or other similar establishment which is primarily devoted to such exhibitions, presentations, shows or performances as a form of expression of opinion, communication, speech, ideas, information, art or drama.

Henrico County enacted this Ordinance in 1982 in response to sundry offensive conduct such as flashing (appearing in public while entirely nude) and public urination. It is undisputed that the Ordinance was not intended to regulate nude dancing establishments and it is agreed that the County has no other ordinance directed to that end. Nor is there located in the County any establishment other than Gold City that offers entertainment in the form of nude dancing.

Donna White and her fellow investors determined that this void could be filled and, with the help of Donna White's husband, Mark White (himself a consultant for a company that operates several such establishments in other states), began to look for a site. They located on Brook Road what they thought was an appropriate site, which was then occupied by a Chinese restaurant, a facility easily adapted to the entertainment mode they intended to offer at Gold City.

Gold City filed its business license application, signed by Donna White, with Henrico County on June 22, 2001, and the license was granted the same day. Shortly after Gold City obtained its license, but before it opened for business, a health inspector, Cindy White, a resident of the neighborhood, entered the premises to perform an inspection at the request of the investors, before Gold City made final closing arrangements on the property. She learned what kind of entertainment Gold City intended to offer and complained to a member of the County's Board of Supervisors that a business of that sort should not be allowed to operate in the area. Other citizens complained to another County Supervisor. As a result, County Manager Virgil Hazlett was asked to look into the matter. Hazlett assigned to his deputy, Harvey Hinson, the task of investigating the situation. On June 27, 2001, Hinson sent an urgent message to various ranking county officials requesting them to quickly gather and compile background information about Gold City, what permits had been issued to Gold City, what approvals had been asked for, whether the approvals had been granted, whether such granted approvals could be rescinded and other questions regarding all manner of requisites for doing business in Henrico County. *See Supplemental Memorandum of Law in Opposition to Motion to Stay All Proceedings,* document numbers 938–39. The information was to be provided to County Manager Hazlett before 4:00 PM that same day. *Id.*

On June 29, 2001, a number of ranking county officials met with Gold City, and were informed that Gold City intended to operate under a "pasties and G-strings" format. Gold City announced that it considered its operation to fall under section 13–107(c), an exception in the Ordinance. None of the officials at the meeting informed Gold City that a "pasties and G-string" format would not fall within the exception. However, Lieutenant Colonel Douglas Middleton, the Deputy Chief of the Henrico Police Department who was acting as the Chief of Police in the absence of the Chief Henry Stanley, told the Gold City representatives that he was unsure whether they would fall within the exception. Acting Chief Middleton advised that he would look into the question. And, he did.

After the meeting, Acting Chief Middleton discussed the matter with the County Attorney, Joseph P. Rapisarda, who, in turn, discussed it with the Commonwealth Attorney, Wade Kizer. Before the end of the day, county officials had reached the conclusion that Gold City would not fall within the exception. Remarkably, and for reasons neither expressed nor readily apparent, Gold City was not notified that the County's executives and law enforcement officials had determined that Gold City's proposed operational format violated the Ordinance. Moreover, on the day Gold City opened, the County's Director of Planning, John Marlles, extended best wishes on the new venture.

As publicity about the forthcoming nude dancing facility mounted, so too did the number of citizen complaints. Those, in turn, prompted an increase in the scrutiny of inspections, as well as a coordinated effort by multiple county departments to observe and investigate potential criminal activity surrounding Gold City.[1] At least some of the apprehension about a nude dancing establishment in Henrico County resulted from recent publicity about the infamous Gold Club in Atlanta, an adult entertainment establishment steeped in criminal activity, namely prostitution, drug trafficking and organized crime. Given the similarity in name of Gold City and Gold Club, some county officials feared that there might be a connection.

Gold City opened its doors for business on July 6, 2001, and that evening police officers entered the premises, issued summons for violations of the Ordinance, and required (or asked) two entertainers to strip down to their pasties and G-strings for photographing. Donna White, a shareholder and manager of the establishment, was issued a summons for aiding and abetting the entertainers in violating the Ordinance. Two days later, on July 8, 2001,

the police again raided Gold City, arresting one dancer and issuing additional summons for violating the Ordinance. Diana White, another shareholder and manager of Gold City, was issued a summons for aiding and abetting the entertainers in violating the Ordinance. Donna White, Diana White and twelve Gold City entertainers are collectively the defendants in the Virginia state criminal proceedings. There have been no further violations of the Ordinance by those associated with Gold City, and gold city entertainers currently comply with the Ordinance. No arrests have been made at Gold City for prostitution, drug trafficking or any other crime, save violations of the Ordinance.

## DISCUSSION

Henrico County has moved to stay the federal proceedings, asserting that this Court must abstain from action under the decision of the Supreme Court of the United States in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. To secure application of the abstention doctrine under *Younger*, the County must establish that: (1) Plaintiffs are involved in an ongoing state proceeding; (2) the ongoing state proceedings implicate important state interests; and (3) there is an adequate opportunity in the state proceedings to raise federal constitutional claims. The County alleges that all aspects of the *Younger* test have been met because the federal Plaintiffs' interests are intertwined with the interests of defendants in state criminal proceedings, the Ordinance is in furtherance of important state interests, and there will be an adequate opportunity to assert constitutional defenses in the state court proceedings. Plaintiffs argue that their interests are not adequately represented by the defendants in the state criminal case and that those

---

**1.** Additional detailed facts will be outlined in    the discussion of the *Younger* exceptions.

proceedings do not afford an adequate opportunity to assert the constitutional issues that are asserted here. It is undisputed that the state criminal proceedings involve important state interests.

## A. *Younger* Abstention

In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court created a bar to federal court interference with ongoing state criminal proceedings. In that case, John Harris was indicted in state court under the California Criminal Syndicalism Act. Harris thereafter filed a complaint in federal district court seeking to enjoin Evelle Younger, the district attorney, from prosecuting him on the grounds that prosecution under the state statute violated his First Amendment rights. The Supreme Court held that an injunction against Younger prosecuting Harris violated "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." *Id.* at 41, 91 S.Ct. at 749.[2]

A unanimous Supreme Court began its analysis with the observation that "[s]ince the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts." *Younger*, 401 U.S. at 43, 91 S.Ct. at 750. Having noted this basic precept of federalism, the Court alluded to the equally important and equally basic doctrine of equity jurisprudence, that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *See Younger*, 401 U.S. at 43–44, 91 S.Ct at 750.

[The] fundamental purpose of restraining equity jurisdiction within narrow limits is . . . important under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity[.]'

*Younger*, 401 U.S. at 44, 91 S.Ct. at 750. The philosophy of *Younger* also embraces a broader rule of comity, namely, that federal courts should abstain from the decision of constitutional challenges to state action, however meritorious the complaint may be, "whenever [the] federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237–38, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984).

In this context, comity means "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44, 91 S.Ct. at 750. *Younger* thus acknowledges and implements the broader concept that ours "is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activi-

---

2. *Younger* was not decided under the Anti-Injunction Act, 28 U.S.C. § 2283. In fact, the Supreme Court explicitly eschewed that ground of decision, *Younger v. Harris*, 401 U.S. at 54, 91 S.Ct. at 755, choosing to decide the issue as one of federalism.

ties of the States." *Younger,* 401 U.S. at 44, 91 S.Ct. at 750.

In *Younger,* and in subsequent decisions, *see, e.g., Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432–34, 102 S.Ct. 2515, 2521–22, 73 L.Ed.2d 116 (1982), the Supreme Court outlined the essential predicates that must be shown before a federal court may enjoin a state court proceeding under the *Younger* doctrine. The Fourth Circuit has adhered to these decisions, restating the test in its case law. *See, e.g., Richmond, Fredericksburg & Potomac R. Co. v. Forst,* 4 F.3d 244, 251 (4th Cir.1993).

■ Because the basic premise behind *Younger* is to avoid federal interference with pending state proceedings, it is first necessary that state proceedings be pending. The second element requires proving the existence of an important state interest behind the challenged law. "Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the constitutional claims." *Hawaii Housing Authority,* 463 U.S. at 1325, 104 S.Ct. at 9; *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521; *Moore v. Sims,* 442 U.S. 415, 426, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979).

Finally, the Supreme Court advanced the proposition that a federal court may not interfere with a pending criminal prosecution in a state court absent a clear showing that "defense of the ... [state] prosecution will not assure adequate vindication of constitutional rights." *Younger,* 401 U.S. at 48–49, 91 S.Ct. at 753 (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 485, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965)). The pertinent inquiry on this aspect of the *Younger* calculus is whether the state proceedings afford an adequate opportunity to raise the constitutional claims alleged in the federal action. *See Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Middlesex County,* 457 U.S. at 432, 102 S.Ct. at 2521. Each predicate element of the *Younger* test will be analyzed *seratim.*

### 1. Pending State Proceedings

There are no state proceedings in which the Plaintiffs here are named parties. Henrico County argues that, even though the Plaintiffs are not named in the state criminal proceedings, the commonality of interests that the federal Plaintiffs share with, and their close ties to the defendants in the state criminal proceedings make the application of *Younger* proper under *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), *Cinema Blue of Charlotte, Inc. v. Gilchrist,* 887 F.2d 49 (4th Cir.1989), and their progeny.

### a. Commonality of Interest

■ In *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), a theater owner challenged a state obscenity statute under which two of his employees were being prosecuted and, upon the authority of which, copies of a film owned by the theater had been seized. The day following service of the federal complaint, state charges were brought against the owner. The Court held that the interests of the theater owner and his employees were so intertwined that *Younger* should apply because the federal relief would interfere with the state prosecution. *Hicks,* 422 U.S. at 348–49, 95 S.Ct. at 2291–92.

As evidence of the relationship between the state and federal parties, the Court in *Hicks* emphasized the federal plaintiffs' "substantial stake in the state proceedings". That substantial stake included, *inter alia,* seized copies of a film, the subsequent charging of the federal plaintiff with violating the statute before the federal court reached the merits of the case and

the fact that the federal plaintiffs' lawyers also represented the state court defendants. The Court concluded that "the rule in *Younger v. Harris* is designed to 'permit state courts to try state cases free from interference from federal courts', ... particularly where the party to the federal case may fully litigate his claim before the state court. Plainly, '(t)he same comity considerations apply' ... where the interference is sought by some, such as appellees, not parties to the state case." *Hicks v. Miranda,* 422 U.S. at 349, 95 S.Ct. at 2292 (citations omitted).

Further elucidation of this doctrine, now often termed "derivative abstention", came in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), wherein the Court held that two corporations that operated bars providing topless entertainment could challenge a county ordinance in federal court despite the fact that a third such corporation, named as a defendant in a pending state proceeding, was precluded by *Younger* from making a similar challenge. In so holding, then Justice Rehnquist, who had joined in the majority opinion in *Hicks* decided the same term, wrote:

> While there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them, this is not such a case; while respondents are represented by common counsel, and have similar business activities and problems, they are apparently unrelated in terms of ownership, control and management. We thus think that each of the respondents should be placed in the position required by our cases as if that respondent stood alone.

422 U.S. at 928–929, 95 S.Ct. at 2566. Thus, the Court reaffirmed the notion that a close relation between state and federal parties could subject the federal plaintiffs to the effects of *Younger.* The Court also noted the importance of such factors as ownership, control and management of a business in determining the existence and kind of relationships that might result in derivative abstention.

The Fourth Circuit applied this principle in *Cinema Blue of Charlotte, Inc. v. Gilchrist,* 887 F.2d 49 (4th Cir.1989). In *Cinema Blue,* the district court granted preliminary injunctive relief prohibiting the arrest or prosecution of the plaintiff and its experts for exhibiting allegedly obscene materials to a community focus group in order to develop expert testimony for the defense in a state prosecution of the plaintiffs for dissemination of purportedly obscene materials. The Fourth Circuit reversed the district court's decision, holding that it should have abstained under *Younger* and, in so doing, explained that "[i]t is no barrier to *Younger* abstention here that the injunction in terms protects individuals who are not parties to the pending state prosecution." *Id.* at 53, 91 S.Ct. 746.

Several federal district courts have expounded on *Hicks* and the concept of derivative abstention. "It is clear ... that *Younger* is not limited to persons named in a state court proceeding; resort to a federal forum is barred to all third parties whose interests are sufficiently 'intertwined' with those who are parties to such a proceeding." *Coast Holding Corp. v. McGuire,* 482 F.Supp. 408, 412 (S.D.N.Y. 1979) (citing to *Hicks* for authority). "If there is a sufficient nexus between the federal plaintiffs ... and those named in the state court matter," *Younger* will force the federal court to abstain. *Id.* at 412.

In *For Your Eyes Alone v. City of Columbus,* 141 F.Supp.2d 1083 (M.D.Ga. 2001), a general manager and so-called "lingerie models" who worked as independent contractors of an adult entertainment establishment commenced an action

against the City of Columbus, challenging ordinances prohibiting private, one-on-one modeling. The parties sought injunctive relief from the ordinance, but did not seek to enjoin or otherwise interfere with the state criminal proceedings that had been brought against the general manager. The district court decided that the facts were very similar to those in *Hicks* and abstained (respecting the general manager) and derivatively abstained (respecting the lingerie models). The court explained that "[s]ince there is an inexact identity of the parties in the state and federal proceedings, the issue is whether a related party is barred by *Younger* from seeking federal court relief despite the absence of a pending prosecution as to that party. The answer to this inquiry lies in the doctrine of 'derivative abstention'...." *Id.* at 1086 (citing as authority *Hicks,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223; *Doran,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648; and *Steffel,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505).

*Younger* and *Hicks* would thus preclude this action from going forward if there is a sufficient nexus between the federal Plaintiffs in this proceeding and those named as defendants in the pending state court criminal proceedings, barring proof of extraordinary circumstances.

On the facts in this record, it cannot be said that the federal Plaintiffs and the state defendants are "unrelated in terms of ownership, control and management". Rather, the state defendants and federal Plaintiffs are all interested in the singular business involved here, with full awareness of what each is doing and with a joint interest in such activities. Two of the

state defendants, Donna and Diana White, own 50 percent of the federal plaintiff company, and they direct, manage and operate Gold City. In fact, Donna White represented Gold City in obtaining the necessary county licenses and she acted on behalf of Gold City in the federal proceedings, signing documents submitted in Gold City's name. She also testified at the hearings on behalf of Gold City. The twelve Gold City entertainers being prosecuted in the state criminal proceedings have interests that significantly overlap with Gold City and the other two federal Plaintiff entertainers. All of the entertainers wish to continue employment with Gold City and each seeks to declare the Ordinance unconstitutional.[3] Given the close relationship of Gold City with its owners and managers, and the shared interests of the Plaintiffs desiring to provide dancing services with the twelve entertainers who are state defendants, there is an "intertwining of interests" that triggers *Younger* abstention in the absence of extraordinary circumstances. Given the close relationship of the parties and the alignment of the parties' interests, this element of the *Younger* test has been met.

### b. Interference with State Proceedings

■ Plaintiffs contend that abstention is not required because they seek only prospective relief in the form of a declaratory judgment and a prospective injunction. Such relief, say the Plaintiffs, does not directly interfere with any state criminal proceedings. That argument, however, ignores the decision in *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), decided the same day as *Younger.*

---

**3.** The County makes much of the fact that the federal Plaintiffs and almost all of the state defendants share the same attorneys. (Defendant's *Motion to Stay All Proceedings,* at 7–8; and Plaintiffs do not challenge this assertion). That argument misses the mark because the

commonality analysis must focus on the similarity of interests of the parties. The fact that counsel are the same in the state and federal proceedings is probative of whether there is in common an interest in presenting the constitutional issues in the state court.

In *Samuels,* the federal plaintiffs filed a declaratory judgment action after they were indicted on state charges of criminal anarchy. As articulated by the Supreme Court:

> The question presented here is whether under ordinary circumstances the same considerations that require the withholding of injunctive relief [under *Younger*] will make declaratory relief equally inappropriate.

*Samuels v. Mackell,* 401 U.S. at 69, 91 S.Ct. at 766. Answering the question in the affirmative the Supreme Court explained:

> We therefore hold that, in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well.

*Id.* at 73, 91 S.Ct. at 768. However, the Court carefully went on to note that:

> We do not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper. There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive; in such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief. Ordinarily, however, the practical effect of the two forms of relief will be virtually identical, and the basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction.

*Id.*[4]

While the Plaintiffs here do not expressly seek to enjoin or otherwise directly interfere with the state proceedings, looking through a prism of pragmatism, the prospective injunction and declaratory judgment sought in Plaintiffs' Prayer for Relief would interfere significantly with the pending state court proceedings. Here, as was true in *Cinema Blue,* the "injunction [sought] ... works the sort of practical interference with an ongoing state criminal proceeding that *Younger* counsels against." 887 F.2d at 53 (*see also Suggs v. Brannon,* 804 F.2d 274, 278 (4th Cir.1986) (though appellants asserted that *Younger* was inapplicable because they did not seek to enjoin the state prosecutions or even to obtain a declaratory judgment that the obscenity statutes were unconstitutional, the court believed that "the issues raised by their complaints and the injunctive relief they [sought, justified] the district court's decision to abstain."); *Cf. Harmon v. City of Kansas City, Mo,* 197 F.3d 321, 325 (8th Cir.1999) (noting that " 'a crucial aspect of this case is that the federal plaintiffs did not seek to enjoin the ... criminal proceeding against [their coplaintiff]' " (quoting *Womens Services, P.C. v. Douglas,* 653 F.2d 355, 356–57 (8th Cir. 1981))); *Wiener v. County of San Diego,* 23 F.3d 263, 267–68 (9th Cir.1994) (*Youn-*

4. Of course, declaratory relief is available if there is no ongoing state prosecution. *Steffel,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505. And, so too is injunctive relief available in that circumstance if such relief is otherwise appropriate. *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Doran,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648.

*ger* abstention does not apply when a federal plaintiff seeks a prospective injunction against prosecutions under an allegedly unconstitutional ordinance and the federal proceedings do not unduly interfere with the legitimate activities of the States)).

*Cinema Blue* teaches that it is appropriate to consider the effect of a federal plaintiff's requested injunctive relief on state criminal proceedings even though the federal plaintiff was not named in the state proceedings and even though the federal plaintiff did not seek direct interference with the state criminal proceedings. "In these circumstances, where the question of the federal plaintiffs' entitlement to 'future injunctive ... relief [was] unavoidably ... decided against the backdrop of pending state proceedings,' *Ballard v. Wilson,* 856 F.2d 1568, 1570 (5th Cir.1988), the result was an injunctive decree that necessarily embodied 'an ongoing federal audit of state criminal proceedings [that] indirectly accomplish[ed] the kind of interference that *Younger v. Harris* ... and related cases sought to prevent.' *O'Shea v. Littleton,* 414 U.S. 488, 500, 94 S.Ct. 669, 678, 38 L.Ed.2d 674 (1974)." *Cinema Blue,* 887 F.2d at 53.

Clearly, *Cinema Blue* is factually distinguishable from the case here because *Cinema Blue* involved an effort by the state defendant·(federal plaintiff) to use the federal proceedings to secure a ruling on matters that truly were ordinary incidents of the state proceedings. Nonetheless, *Cinema Blue* instructs that federal courts must look to the practical effect of granting the relief sought by the federal Plaintiff.

The same message is clear in the text of *Samuels,* wherein the Supreme Court gave considerable emphasis to the practical effect of a declaratory judgment. For instance, the Court explained that a federal court is empowered to enforce its declaratory judgments and that such enforcement

actions, usually by way of injunction, often could "result in a clearly improper interference with the [pending] state proceedings." *Samuels,* 401 U.S. at 72, 91 S.Ct. at 768. Furthermore, "even if the declaratory judgment is not used as the basis for an injunction," the federal judgment can be pressed as *res judicata* and " '[i]f so, the federal court has virtually lifted the case out of the State [court] before it could be heard. If not, the federal judgment serves no useful purpose as a final determination of rights.' " *Id.* (quoting *Public Svc. Comm'n of Utah v. Wycoff,* 344 U.S. 237, 247, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952)).

These principles inform the analysis to be made here. For example, if this Court were to declare the Ordinance unconstitutional and, thereupon, were to grant the other prospective relief requested, the Court would provide the state criminal defendants a significant defense to their prosecutions. Indeed, the defendants in the state proceedings certainly would urge this Court's decision as *res judicata* as to the Ordinance's deficiencies under the Constitution of the United States. "At the very least, [such a judgment's] practical effect [would be] to raise the specter of a federal pre-judgment" that the Ordinance, as applied to the similarly situated state court defendants, is unconstitutional. *Cinema Blue,* 887 F.2d at 53. Given the clear and strong nexus between the Plaintiffs in this action and the state court defendants as well as the virtual identity of interests that they share, the state court could not make a decision respecting constitutional defenses to this Ordinance *tabula rasa.*

## 2. Important State Interests Are Implicated

The Commonwealth has significant interest in the adjudication of Henrico County's public nudity statutes, adopted pursuant to Henrico County's power to protect

the health, safety and welfare of its citizens. *See* Va.Code § 15.2–1200. Plaintiffs and Defendants agree that important state interests are implicated here and that this predicate element for application of *Younger* is not at issue.[5]

### 3. Adequate Opportunity To Raise Federal Claims

■ Plaintiffs contend that they cannot be assured adequate vindication of their constitutional rights in the state proceedings, thus making abstention improper. Without doubt, if that were the case, *Younger* abstention would not be appropriate. *See Younger*, 401 U.S. at 48–49, 91 S.Ct. at 753; *Dombrowski*, 380 U.S. at 485, 85 S.Ct. at 1120 (1965); *Cinema Blue*, 887 F.2d at 53.

First, Plaintiffs claim there will not be an adequate opportunity to litigate their "as applied" constitutional challenges in state court because, in Virginia state criminal proceedings, the discovery necessary for them to substantiate "as applied" challenges is not available. It is true that, under the applicable Virginia law, Plaintiffs would not typically be entitled to such discovery. *Przechowski v. Commonwealth of Virginia*, 1999 WL 1129816 (Va. App. June 1, 1999) (holding that discovery

in state criminal proceedings is limited to felony charges). However, that impediment to adequate presentation of the constitutional issues (assuming, without deciding, that it is an impediment under *Younger* jurisprudence) is no longer a concern because the Plaintiffs have had in this action all the discovery they require.[6]

Furthermore, during the hearings associated with this action, Henrico County agreed not to contest the introduction of evidence into the state court proceedings that was obtained through the federal discovery or in the federal evidentiary hearing. Moreover, witnesses can be subpoenaed to obtain in-court testimony, and evidence obtained through the concluded, extensive federal discovery can be introduced if those witnesses refuse to appear, change their testimony or acquire recollection deficiencies.

Second, in an argument raised for the first time at the hearing on September 6, 2001, the Plaintiffs contend that the State Courts are "not equipped" to decide the federal constitutional issues presented by this case. That theory was not fully explained but, by it, the Plaintiffs seemed to take the view that the state court is not as accustomed to applying the controlling federal law as is this Court. Even if such an

---

**5.** The Supreme Court in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504 (1991), and other cases recognize that public nudity ordinances further a substantial government interest:

> This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation. In *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), we said:
> In deciding *Roth [v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) ], this Court implicitly accepted that a legislature could legitimately act on such a con-

clusion to protect 'the social interest in order and morality.' [*Id.*], at 485, 77 S.Ct. 1304. (Emphasis omitted.)
And in *Bowers v. Hardwick*, 478 U.S. 186, 196, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), we said:
> The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed.

Thus, the public indecency statute furthers a substantial government interest in protecting order and morality.

**6.** The same discovery that was necessary to litigate the bad faith or harassment issues here is probative of the issues respecting the Plaintiffs' "as applied" challenge.

assumption were true, it certainly does not mean that the state court provides an inadequate opportunity for resolution of the constitutional issues.

Indeed, the controlling federal law is fairly settled by decisions of the Supreme Court. *See, e.g., City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). The issues that govern application of that settled law are principally factual, a task as to which state courts have capacity no less than federal courts. Hence, there appears no ground for apprehension respecting the capability of the state court to decide the constitutional issues.

The related theme that appears in the Plaintiffs' pleadings, and in their argument as made on September 6, 2001, is that the issues here are so emotionally charged and so politically volatile that the state court cannot be counted on to withstand the pressure or to do that which, according to the Plaintiffs, the Constitution of the United States requires. Put another way, the Plaintiffs, having been subjected to what they consider unfair treatment at the hands of the County's Supervisors, administrators and law enforcement officials, are apprehensive that the state judiciary can be expected to act likewise.

It is true that the opening of Gold City has generated a great deal of publicity and outcry from neighbors. It is also true that Supervisors, administrators and law enforcement officials have given Gold City unprecedented attention and scrutiny. Furthermore, it is troublesome indeed that: (1) a week before Gold City opened for business, Gold City informed some of the County's highest-ranking officials of the mode of dancing ("pasties and G-string") to be performed; (2) at the same time Gold City explained to those officials the view that Gold City was covered by an exception to the Ordinance; (3) the Acting Chief of Police represented that he was uncertain about the matter, but would look into it; (4) he do so; (5) the same afternoon, the County Attorney and the Commonwealth's Attorney and the Acting Chief of Police had concluded that Gold City: (a) was wrong in its interpretation of the Ordinance; (b) the mode of dancing Gold City would use was in violation of the Ordinance; and (6) the County never informed Gold City of these views.

Worse still, the County's Planning Director, who chaired the meeting on June 29, 2001, actually telephoned Gold City on opening day, July 6, 2001, and wished the owners well in their new venture. All the while, the County's law enforcement officers were preparing to arrest the owners, managers and dancers of Gold City.

Beyond serious question, that treatment is unreasonable, unbecoming of government and unfair. There is, of course, no duty on the part of the County generally to caution citizens against violating the law. But, where, as here, a citizen discloses to high ranking County officials how it plans to operate under an ordinance that is far from clear and the County's top law enforcement officer promises to look into the legality of the matter, the citizen is reasonably entitled to believe that its view is acceptable if the County not only does not say otherwise but wishes the citizen well in its endeavors.[7]

On these facts, the Plaintiffs' apprehensions about the fairness it will receive in state court are not irrational. And, their apprehensions are not diminished where, as here, a third County Supervisor is reported to have stated on the day after the

---

7. Indeed, under the facts presented here, the County, having promised to look into the matter, may have a duty to tell the citizen of its conclusion that his proposed conduct violates the law.

evidentiary hearing in this case that the Ordinance will be toughened and enforced, not on the basis of constitutional precepts, but rather on the basis of what the citizens feel "is needed, or is too much, or is not enough." [8]

Nonetheless, state courts often are called upon to decide emotionally charged, politically sensitive issues, most, of which, involve serious consequences. Apprehensions that the state courts will afford adjudication of the contested constitutional issues the same kind of treatment Gold City considers itself to have received so far at the hands of County officials have no place in assessing whether a state court will afford an adequate opportunity for adjudication of constitutional issues. In fact, nothing in this record suggests that the constitutional issues will receive other than a full and fair hearing by an unbiased judicial officer.

Moreover, this Court indulges the assumption that state courts provide a forum where defendants may vindicate federal constitutional rights, in particular, the right to provide an adequate defense to criminal charges. Any denial of that right is obviously subject to challenge in the state courts by some appropriate device, and any adverse ruling on such a challenge is subject to preservation for constitutional review. *See Cinema Blue*, 887 F.2d at 54 (though the Fourth Circuit did not articulate the exact method with which state court defendants could vindicate constitutional rights in state court proceedings, the court assumed that such vindication must

be possible as it is mandated by the Sixth Amendment).

Third, the Plaintiffs contend that, because the state court can grant neither declaratory nor injunctive relief in the criminal case, the state proceedings do not provide an adequate opportunity to present the constitutional issues. It is correct that the State criminal proceedings do not afford an avenue for declaratory or injunctive relief, but that does not necessarily mean that the state court is an inadequate forum for presenting the constitutional issues. That is because, under Fourth Circuit precedent, *Younger* requires only that there be an opportunity to be heard on the constitutional challenge in a pending state proceeding. As the Fourth Circuit has explained:

> The abstention condition is merely that there be a pending state proceeding in which an opportunity to raise the constitutional challenge will be available to the federal plaintiff. *Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir.1986). Though we may not be sure exactly what procedural mechanism for doing so will be most appropriate, it is not necessary that we be. It suffices to be confident that it can be raised in some appropriate way, and that we are.

*Cinema Blue*, 887 F.2d at 54.

The state court has before it, and must decide, the same constitutional issues that are presented here. If the state court finds that the Ordinance is constitutional, there will be no occasion for declaratory or injunctive relief from this Court.[9] If,

---

8. Chris Dovi, *Nudity Statute Under Review*, Richmond–Times Dispatch, Sept. 10, 2001, Section B, p. 1.

9. Of course, the only federal court that can review that decision is the Supreme Court of the United States. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct.

149, 68 L.Ed. 362 (1923). And, under the *Rooker–Feldman* doctrine, the constitutional issues must have been presented to the state courts to preserve the availability of review by the Supreme Court of the United States. Certainly, Donna and Diana White can be expected to do that even if the twelve entertainers who are state court defendants could not.

however, the state court finds that the Ordinance offends the First Amendment, and, if as the Plaintiffs apprehend, the County continues to attempt to enforce the Ordinance by further state prosecution, continued abstention, under *Younger*, likely will not be warranted. Indeed, it is noteworthy that, as emphasized by Henrico County, if the defendants in the state proceedings are found not guilty based on constitutional grounds, future prosecutions against the defendants or related parties under the Ordinance could be considered either a bad faith prosecution or harassment, or both; and a federal case could then proceed under the bad faith and the harassment exceptions to *Younger*. *See Reply Memorandum in Support of Motion to Stay All Proceedings*, at 11; Rapisarda, Hrg. Sept. 6–7, 2001.

For the foregoing reasons, the conditions for abstention under *Younger* have been satisfied. Thus, abstention is required unless the Plaintiffs can establish that one of the recognized exceptions to *Younger* is applicable.

## B. Exceptions To *Younger* Abstention

The same day the *Younger* opinion was issued, the Supreme Court, explained that "[o]nly in cases of *proven harassment or prosecutions undertaken* by state officials *in bad faith* without hope of obtaining a valid conviction *and perhaps in other extraordinary circumstances* where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971) (emphasis added). *See also Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975) ("*Younger* ... allow[s] intervention in those cases where ... the state proceeding is motivated by a *desire to harass or* is conducted *in bad faith*, or where the challenged statute is *'flagrantly and patently violative of express constitutional prohibitions* in every clause, sentence and paragraph, ....'" (citations omitted)) (emphasis added).[10]

■ Thus, the Supreme Court has outlined four general circumstances in which *Younger* abstention, even if all three predicate elements are shown, is not appropriate: (1) bad faith: a state prosecution undertaken without reasonable hope of obtaining a conviction; (2) harassment; (3) flagrantly or patently unconstitutional law; and (4) other extraordinary circumstances.

Before addressing the exceptions, it is necessary to confront two preliminary questions. First, it is appropriate to consider the County's argument that the "bad faith" and "harassment" exceptions are really the same. That contention is at odds with the plain text of *Perez v. Ledesma* and *Huffman v. Pursue, Ltd.* Contrary to the County's argument, *Suggs*, 804 F.2d 274, does not hold otherwise. *Suggs* merely explains that "[b]ad faith in the [*Younger*] context *'generally* means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction.'" *Id.* at 278 (emphasis added). *Suggs*, thus, does not say that the bad faith and harassment exceptions are one and the same.

Second, it is important to note the effect of the Plaintiffs' failure to prove irreparable injury because immediate great and irreparable injury is required to permit federal injunctions of state proceedings. To begin, here, unlike *Younger*, the Plaintiffs do not actually seek an injunction of

---

**10.** The Fourth Circuit in *Suggs*, 804 F.2d at 278, noted that "the exceptions to the *Younger* doctrine are narrow." (citing to *Huffman*, 420 U.S. at 611, 95 S.Ct. at 1211–12, as authority).

the pending proceedings. But, they do ask for prospective injunctive relief and in view of the fundamental policy against federal interference with state criminal prosecutions, the Plaintiffs must show irreparable injury as the essential prerequisite to injunctive relief. However, even irreparable injury is insufficient to warrant such interference unless injury is both "great and immediate", *Younger*, 401 U.S. at 46, 91 S.Ct. at 751. The cost, anxiety, and inconvenience of defending against a single criminal prosecution is not usually irreparable. In most cases, "the injury that [the petitioner] faces is solely 'that incidental to every criminal proceeding brought lawfully and in good faith.'" *Id.* at 49, 91 S.Ct. at 753. "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 46, 91 S.Ct. at 751. The rationale for this requirement is that "ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights [,]" *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975).

■ The Plaintiffs must show that the irreparable harm is greater than that found in the defense of a good faith prosecution and that it is immediate and great. "Moreover, the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so." *Younger*, 401 U.S. at 51, 91 S.Ct. at 754 (citations omitted).

Of course, a bad faith prosecution and, in many cases, harassment and, in most cases, prosecution under a flagrantly, patently unconstitutional law will constitute irreparable injury so the *Younger* exceptions themselves, if proven, supply sufficient proof of injury to warrant injunctive relief. Even if that were not so, the Plaintiffs here seek declaratory relief so the exceptions would have to be measured for application in any event.

■ Mindful of the foregoing precepts, each *Younger* exception will be examined in turn.

### 1. Bad Faith

Bad faith in the *Younger* sense "generally means a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler*, 421 U.S. at 126 n. 6, 95 S.Ct. at 1531 n. 6; *Suggs*, 804 F.2d at 278; *Londono–Rivera v. Commonwealth of Virginia*, 2001 WL 640660, *7 (E.D.Va. June 4, 2001). The question of bad faith in the *Younger* context is largely a question of fact to be determined by the district court. *Wilson v. Thompson*, 593 F.2d 1375, 1388 (5th Cir.1979). As an example of a bad faith prosecution, *Younger* cites *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In *Dombrowski*, civil rights activists were arrested and their offices raided and files seized under the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. A state judge quashed the arrest warrants for lack of probable cause and granted a motion to suppress, but state officials continued to threaten prosecution. A three-judge panel issued a temporary restraining order (TRO) against prosecutions, but the TRO was dissolved after a hearing. A grand jury returned additional indictments. While "[i]t is generally to be assumed that state courts and prosecutors

will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings[,]" *id.* at 484–85, 85 S.Ct. at 1120, on the facts in *Dombrowski,* "a series of state criminal prosecutions will not provide satisfactory resolution of constitutional issues." *Id.* at 489, 85 S.Ct. at 1122. These circumstances, as viewed by the Supreme Court, sufficiently established the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention. *See Younger,* 401 U.S. at 48, 91 S.Ct. at 752.

The question then is whether the County commenced the prosecution in the state court without a reasonable expectation of obtaining a valid conviction. While there is a significant question as to whether Gold City is excluded from the exception under section 13–107(c), Wade Kizer, the Commonwealth's Attorney, directed his staff to research the constitutionality of the Ordinance before bringing the charges. *See* Kizer Dep. at 5–6. His staff advised that the Ordinance passed constitutional muster. He also consulted with the County Attorney who had reached the same result. Similar, although not identical ordinances, have been upheld by other courts, albeit on considerably different facts. *See, e.g., Bomhower v. City of Virginia Beach,* 76 F.Supp.2d 681 (E.D.Va.1999); *Cafe 207, Inc. v. St. Johns County,* 856 F.Supp. 641 (M.D.Fl.1994); *Wayside Restaurant, Inc.*

*v. City of Virginia Beach,* 215 Va. 231, 208 S.E.2d 51 (1974).

Mr. Kizer appears to have given thought to the constitutionality of the Ordinance and, only after research and review of evidence obtained by undercover officers, did he make a decision to go forward with the prosecution. Mr. Kizer believes that the exception does not apply to Gold City and that the Ordinance is constitutional. There is no evidence that he ever believed otherwise. Thus, the facts presented on this record indicate that the state prosecutor reasonably could have expected, within the meaning *Younger* jurisprudence, to have obtained a valid conviction in state court.

Mr. Kizer may well be wrong on both counts, but the "reasonable expectation" of a valid conviction standard does require that the state prosecutor be right. "The Younger doctrine presumes that 'the only constitutional issue at stake is the validity of the challenged state law that being prosecuted under an arguably (or actually) invalid law is not itself a violation.'" *Wilson v. Thompson,* 593 F.2d 1375, 1382 (5th Cir.1979). One must deliberately assess what is known to him and deliberately measure those facts and application of the law to them and make a reasoned decision. Mr. Kizer undertook the deliberation required of him. That he might have erred in his conclusion does not animate the *Younger* bad faith exception.[11]

**2. Harassment**

Often, as in *Dombrowski,* bad faith and harassment go hand in hand, and, where that is so, the determination that there

---

11. That is not to say that rote recitation of deliberation and study by a prosecutor alone will foreclose the bad faith exception, but where, as here, there is decisional law that appears to support a prosecutorial decision, the prosecutor is not in bad faith merely because he has misapprehended the decisional law that he has consulted. Thus, even if as the Plaintiffs contend, Mr. Kizer was wrong, that does not constitute bad faith under *Younger.*

was a reasonable expectation of obtaining a conviction does not conclude the analysis of bad faith and harassment under *Younger. See, e.g., Lewellen v. Raff,* 843 F.2d 1103 (8th Cir.1988) (the Eighth Circuit disagreed with the district court in the district court's opinion that other factual findings were irrelevant and that the sole issue in the context of bad faith and harassment was whether the prosecutor had a reasonable expectation of convicting.) All factors should be taken into account. Thus, even if the County's conflation of these two separate factors is correct, the facts respecting harassment have a bearing on whether there is a bad faith prosecution. But, for harassment to be a part of bad faith in the *Younger* sense, it appears to be necessary that there be shown a temporal and causative nexus between the acts of harassment and the institution of the prosecution.[12]

Plaintiffs have enumerated myriad actions on the part of the County that Plaintiffs contend constitute harassment. They are considered individually and as a whole below.

### a. Failure To Inform Gold City That Its Format Would Violate The Ordinance

During the June 29, 2001, meeting with the County officials, Gold City announced it would be providing live entertainment in the form of dancing by female entertainers who would be wearing only pasties and G-strings. The record indicates that the Acting Chief of Police expressed uncertainty about whether such entertainment would fall within provision section (c) of the Ordinance, the exception clause, and promised to look into the matter. Later the same day, County officials concluded that Gold City would not fit within the exception. Before Gold City opened its doors to the

public, no County official had communicated that the type of entertainment to be offered would violate the Ordinance.

It seems fundamentally unfair that, after Plaintiffs announced to Henrico County officials the intention to offer live entertainment featuring a format of females dancing in pasties and G-strings and had published their belief that such a format fell within the exception to the nudity ordinance, Gold City was not given notice that its actions would be considered illegal by the County. Instead, Gold City's notice was first conveyed by way of a police raid on Gold City's opening night. While these facts evince bad judgment and unfair treatment of a county citizen, the record reflects that the failure of notice was caused not by a motive to harass, but by a failure to communicate, which itself was spawned by a desire on the part of law enforcement officials and the County's administrators to respond quickly to citizen complaints and inquiries from members of the Board of Supervisors. Unreasonable though it was, not to have given Gold City a chance to conform its behavior to the law as interpreted by the County, this lapse is not shown by the record to have been intended as harassment.

### b. The "No Parking" Signs

"No Parking" signs were placed on the street in front of Gold City, eliminating a substantial portion, perhaps even more than half, of Gold City's available parking. Deposition testimony pointed out by Henrico County sheds doubt on whether the no parking signs were erected to harass Gold City. Other no parking signs had been erected nearby on Brook Road (Foster Dep. at 24) and Chief of Police Stanley, having 6 years experience as a traffic engineer, testified as to non-arbitrary bases for

---

12. A pattern of harassment both before and after institution of the state prosecution would be probative of the animus that attended the decision to prosecute.

erecting the signs. Stanley Dep. at 15–16; Stanley, Hrg. Sept. 6–7, 2001. The timing of this conduct admittedly is suspicious, but suspicion does not equate to proof of a motive to harass.

### c. Excessive Police Scrutiny

Plaintiffs complain that undercover officers performed excessive intelligence gathering with respect to Gold City's owners, officers, employees and even customers. It is true that undercover officers were sent into Gold City frequently, and significant background information was obtained respecting Gold City's owners, employees and customers. For example, on certain days, County police ran checks on the license plates of every vehicle entering the Gold City parking lot. While monitoring the employees of Gold City could be justified, it is a more difficult matter to justify the decision to check every vehicle going into or out of Gold City's parking lot. It is now said that this scrutiny was occasioned by suspected drug related activity at the facility, but the basis for those suspicions post-dated the commencement of the license plate checks for all vehicles. Thus, it appears that the scrutiny of this sort was based on intuition, not evidence.[13] This kind—and level—of investigation appears, in fact, to have been prompted by the belief that Gold City was related to the infamous Gold Club in Atlanta which was, at the time, involved in a much publicized trial on serious criminal charges. No such connection ever surfaced, but it is not harassment for the County police diligently to have looked into the matter, even if they were overzealous in doing so.

### d. Virginia ABC Board Activity

After initially issuing Gold City a liquor license, an official from the Henrico County Health Department called John Alexander of the Virginia Alcohol and Beverage Control (ABC) Board to inquire into the ABC Board's procedures for issuing liquor licenses. It was brought to Mr. Alexander's attention that he had issued Gold City a liquor license without Gold City having obtained a health permit. Thus, "Henrico County was giving him heat" (Donna White Dep. at 72; Alexander, Hrg. Sept. 6–7, 2001) and Mr. Alexander went to the premises of Gold City and took physical possession of the liquor license. The license was not revoked. The County did not coordinate the taking of the liquor license to harass Gold City, rather, it was taken because Mr. Alexander did not follow proper procedure and there was concern that alcohol would be sold before Gold City had obtained a health permit. When this permit was issued by the County, Mr. Alexander returned the liquor license in less than an hour.

### e. Conduct At The Time Of Arrest

A number of entertainers were asked or forced (depending on whose testimony is believed) to strip to the pasties and G-strings for photographing during the initial police raid on July 6, 2001, because pasties and G-strings were what was worn when violating the Ordinance. Kizer Dep. at 23, 66–7; Plaintiff document numbers 189–90. Because the act of dancing had been videotaped earlier in the evening, forcing the entertainers to strip for photographing seems cumulative and unnecessary, even if constitutional. But, even if this occurred

---

**13.** The record indicates that the intuition was right in that two employees engaged in solicitation of drug transactions, one on the premises, one off. And, there is evidence of solicitation of prostitution by one of the entertainers. It should be noted that there is no evidence that the corporate Plaintiff knew of or condoned any such conduct or that the individual Plaintiffs ever engaged in either kind of conduct.

(and there is some substantial doubt that it did) that conduct does not amount to harassment under *Younger*.

### f. Prosecution As Retaliation

Plaintiffs assert that the "criminal prosecutions were clearly brought in retaliation for the exercise of rights protected by the First Amendment ...," *Supplemental Reply Memorandum of Law in Opposition to Motion to Stay All Proceedings,* at 3; however, there is no evidence to support this assertion.

### g. Pattern Of Misconduct

The Plaintiffs assert that the coordinated efforts of the various county departments is indicative of a pattern of bad faith use of the County's legal and administrative mechanisms for the purpose of driving Gold City out of business. That, if true, would constitute harassment by the County.

Such a pattern of misconduct was uncovered in *Black Jack Distributors v. Beame,* 433 F.Supp. 1297 (S.D.N.Y.1977), which case Plaintiffs assert is applicable under the instant circumstances. In *Black Jack,* plaintiffs, vendors of sexually explicit materials, had alleged that the New York City Police Department and the District Attorney's Office were engaged in a joint effort to clamp down on sexually oriented businesses in Manhattan in general and, more specifically, to force plaintiffs out of business. Daily arrests and seizures were made at plaintiffs' premises "in a manner calculated to maximize the negative impact on plaintiffs' business." *Id.* at 1306. Defendants' admitted purpose was to discourage plaintiffs' employees from continuing to work in plaintiffs' stores and, ultimately, to close the stores or force them to abandon the sale of sexually oriented materials. For instance, Sidney Baumgartner, Assistant to the Mayor and the Head of the Midtown Enforcement Project stated that "despite all constitutional limitations we stop at nothing when we put these (sexually oriented enterprises) out of business. We undertake activities knowing that they are illegal." *Id.* at 1307. The court granted a preliminary injunction which prevented the New York City Police Commissioner from harassing plaintiffs through enforcement of obscenity laws which were undertaken in bad faith and for the purpose of injuring plaintiffs' business.

While there are some similarities between *Black Jack* and the present facts, no malice, use of illegal arrest methods, high numbers of repeated arrests and raids or evidence of a concerted effort to put Gold City out of business are discernable. The police investigation was legitimately pursued under the police investigatory prerogative to look into suspected criminal activity. After receiving criticism, constituent complaints and considerable local press coverage, it appears Henrico County took measures to ensure that Gold City did not violate any county or state laws and that the business would be legitimately run. Similar to *Black Jack,* some interviews of county officials (including a County Supervisor) with the media may raise apprehension about the extent to which these officials respect the Constitution of the United States and the law of the land as articulated by the Supreme Court of the United States, but much of what has been reported in the media simply represents "puffing" and perhaps a misunderstanding of the United States Constitution and the precepts of federalism. This record, therefore, does not call into application the decision in *Black Jack.*

In sum, although the complained of conduct of the County is unusual and represents an admittedly unprecedented zeal by local government, the conduct does not rise to the level of harassment required by *Younger*.

### 3. Patent Unconstitutionality

Plaintiffs are correct in asserting that a patently unconstitutional ordinance would preclude the application of *Younger*. " '[A] statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " *Younger*, 401 U.S. at 53–54, 91 S.Ct. at 755 (quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)). *See also Tolbert v. City of Memphis*, 568 F.Supp. 1285 (W.D.Tenn.1983); *Nadeau v. Charter Township of Clinton*, 827 F.Supp. 435 (E.D.Mi.1992).

The predicate for assessment of this exception is an acknowledgment that the Supreme Court of the United States views "nude dancing ... is expressive conduct that is entitled to some quantum of protection under the First Amendment, ...." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 285, 120 S.Ct. 1382, 1388–89, 146 L.Ed.2d 265 (2000). *See also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Hence, though the subject matter here is, as the Plaintiffs admit, mundane, it involves a well-settled right under the First Amendment. The exercise of that right may be circumscribed by local law, but the law, as applied, must allow the conduct permitted by the First Amendment. The law, of course, must clearly define the proscribed conduct and must be enforced equally, and not arbitrarily or capriciously, when it is applicable.

When measured against these precepts, the Ordinance is troublesome. On its face, as admitted by the Commonwealth's Attorney, the Ordinance would make it unlawful for a mother to nurse her child in public,

conduct that often occurs in today's society and that is widely accepted. It, by admission of the Commonwealth's Attorney, would prohibit the wearing of bathing suits commonly sold in the County and worn at its public pools and at private clubs, though the Ordinance would not necessarily be enforced against each technical violation. (Ct.Exs. 1–5, Hrg. August 7, 2001; Kizer Tr. 74–76, Hrg. August 7, 2001). Though admitting that both were technically violative of the Ordinance, the Commonwealth's Attorney would permit Jennifer Lopez to wear one famously revealing dress (Ct.Ex. 1, Hrg. Sept. 6–7, 2001; Kizer, Hrg. Sept. 6–7, 2001), but prohibit her from wearing another as to which it is difficult to discern a difference.[14] (Ct.Ex. 2, Hrg. Sept. 6–7, 2001; Kizer, Hrg. Sept. 6–7, 2001). Some of these violations would be prosecuted; others would not. (Kizer Tr. 74–76, Hrg. August 7, 2001; Kizer, Hrg. Sept. 6–7, 2001).

The Ordinance contains a provision, section (c), that permits the very conduct engaged in by and at Gold City to be performed in a different, but nonetheless public, venue. Mr. Kizer testified that, while a ballet at a dance hall, featuring completely nude dancers for the duration of the performance, would not be prohibited by the Ordinance, dancing in pasties and G-strings on the stage at Gold City does not fall under the exception. Section (c) has serious exposure to constitutional challenge as to its application, especially in perspective of Mr. Kizer's testimony that the content of constitutionally protected expressive conduct plays a role in assessing whether that conduct violates the Ordinance.

While it does appear that a constitutional challenge to the Ordinance, as applied to these Plaintiffs, might be successful, it can-

---

**14.** Ms. Lopez's outfit in Court Exhibit 2 of the Hearing of September 6–7, 2001, was worn on national television during the Grammy Awards Ceremony.

not be said that the Ordinance violates "'constitutional prohibitions in every clause, sentence and paragraph and in whatever manner and against whomever an effort might be made to apply it.'" *Younger,* 401 U.S. at 54, 91 S.Ct. at 755 (quoting *Watson v. Buck,* 313 U.S. 387, 403, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)). For example, it might be, as the Plaintiffs urge, that the exception of section (c) applies. If so, this exception to *Younger* would not apply. Moreover, if that is how the state court interprets the Ordinance, there will be no need for a decision on its constitutionality.

### 4. Other Extraordinary Circumstances

The Supreme Court has never limited the universe of exceptions to *Younger* abstention. "There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." *Younger,* 401 U.S. at 53, 91 S.Ct. at 755. There is little precedent establishing what may constitute "other extraordinary circumstances". The Supreme Court commented that "[o]ther unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be." *Younger,* 401 U.S. at 54, 91 S.Ct. at 755. The Court later explained that, "whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Kugler,* 421 U.S. at 125, 95 S.Ct. at 1531. No such extraordinary circumstance has been shown here.

### CONCLUSION

The principles of *Younger* apply under the facts presented, and as there is no great and immediate irreparable injury and there are no extraordinary circumstances calling for immediate federal review, in the interests of equity and comity, this Court abstains, allowing the state courts of Virginia to proceed unhindered by federal judgment of a Virginia law.

For the foregoing reasons, the Defendant's Motion to Stay All Proceedings is GRANTED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by regular mail.

It is so ORDERED.